124          August 23, 2022          No. 7

## IN THE OREGON TAX COURT
## REGULAR DIVISION

### SANTA FE NATURAL TOBACCO COMPANY,
*Plaintiff,*

*v.*

### DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant.*

(TC 5372)

Plaintiff was an out-of-state manufacturer, marketer, and distributer of tobacco products, and sold its products to wholesalers located in Oregon (wholesalers), which then sold products to retailers located in Oregon (retailers). Plaintiff had employees located in Oregon who solicited retailers to place orders for Plaintiff's products. These "Pre-Book Orders" were sent to the wholesaler by Plaintiff's employee on behalf of the retailer. As part of its Distributer Incentive Program (DIP), wholesalers were required to accept all returns—for any reason—of Plaintiff's products by retailers. The Department of Revenue argued that these activities fell outside of the protection provided by 15 USC section 381 (PL 86-272), destroying Plaintiff's immunity from Oregon income tax. Under *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 US 214, 112 S Ct 2447, 120 L Ed 2d 174 (1992) (*Wrigley*), the court concluded that Plaintiff's requirement that wholesalers accept all returns of Plaintiff's products caused the wholesalers to engage in an activity on Plaintiff's behalf that was not ancillary to "making sales" under 15 USC section 381(c), and therefore destroyed Plaintiff's immunity. Likewise, Plaintiff lost immunity because the "Pre-Book Orders" facilitated the placement of orders, rather than the "solicitation" of orders. The court further concluded that the Pre-Book and returns activities were not sufficiently *de minimis* to avoid the loss of tax immunity. The court held that Plaintiff was not subject to the substantial understatement penalty imposed by ORS 314.402(1) because Plaintiff's positions were reasonably based on PL 86-272 or *Wrigley* in compliance with ORS 314.402(4)(b)(B).

Trial was held October 15, 2020, in the courtroom of the Oregon Tax Court, Salem.

Mitchell A. Newmark, Blank Rome LLP, New York, argued the cause for Plaintiff.

Darren Weirnick, Senior Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant.

Decision rendered August 23, 2022.

**ROBERT T. MANICKE, Judge.**

## I.   INTRODUCTION

The substantive issue in this case is whether 15 USC section 381[1] (PL 86-272) protected Plaintiff (taxpayer) from Oregon's net income tax for the tax years ending December 31, 2010 through 2013 (Years at Issue).[2]

## II.   FACTS

The parties submitted the case for trial on stipulated facts, which are found in the parties' 17-page narrative stipulation and stipulated exhibits, all of which the court admits into evidence. During the Years at Issue, taxpayer was an out-of-state manufacturer, marketer, and distributor of cigarettes and certain other tobacco products (collectively, Products), selling to customers throughout the United States. Taxpayer had no offices in Oregon and had none of its own inventory of Products in Oregon for sale or return.

Taxpayer sold its products to wholesalers, including wholesalers located in Oregon (Oregon Wholesalers or Wholesalers), which sold the products to retailers, including retailers located in Oregon (Oregon Retailers or Retailers).[3]

### A.   *Facts Related to Product Returns*

#### 1.   *"100% Product Guarantee"*

Taxpayer "provided \*\*\* Oregon Retailers[] a '100% Product Guarantee' on SFNTC Brand Cigarettes that Oregon Retailers purchased from Oregon Wholesalers."[4]

---

[1] Unless otherwise indicated, references to the United States Code (USC) and the Oregon Revised Statutes (ORS) are to the 2013 editions.

[2] The court previously decided certain evidentiary issues. *See Santa Fe Natural Tobacco Co. v. Dept of Rev.* 24 OTR 549 (2021). The order invited submission of one or more *amicus* briefs under Tax Court Rule 48, and the court granted the application of *amicus* Multistate Tax Commission (MTC) in support of Defendant (the department). The court appreciates the discussion of historical and policy issues in the MTC brief; however, the court today decides the case solely on the basis of the authorities cited in this opinion.

[3] During 2010, taxpayer also sold its products directly to some Oregon Retailers, although many Oregon Retailers bought Taxpayer products from wholesalers, including Oregon Wholesalers. After 2010, taxpayer no longer accepted orders from Oregon Retailers.

[4] As defined in the parties' stipulation, "SFNTC" refers to Taxpayer, and "SFNTC Brand Cigarettes" is synonymous with the Products as defined in this opinion.

The "100% Product Guarantee" is a one-page document that Taxpayer updated approximately annually. During 2010 and the first half of 2011, the 100% Product Guarantee stated:

"**SANTA FE NATURAL TOBACCO COMPANY**

"**100% PRODUCT GUARANTEE**

"All products manufactured by Santa Fe Natural Tobacco Company (Natural American Spirit) or represented by SFNTC (Dunhill and State Express) (collectively, 'Tobacco Products') are 100% guaranteed. Non-saleable Tobacco Products may be returned, at our expense, for product replacement or refund.

"Customers making returns directly to SFNTC must include a Return Authorization Number issued by SFNTC with the return shipment. To request a Return Authorization Number, call 1 (866) [redacted] and ask for Returns.

"Retailers making returns to a distributor are not required to obtain authorization from SFNTC. SFNTC's representatives will not sticker or mark Tobacco Products at retail or require paperwork authorizing a retailer to return such Tobacco Products to its distributor.

"Distributors may accept returns from retailers for any reason. Distributors are not required to obtain SFNTC authorization in order to accept returns from retailers.

"Please inspect the contents of your shipment upon receipt to ensure that any problems are discovered and reported as soon as possible. Any problems should be reported immediately by calling us at 1 (866) [redacted]."

Effective through June 30, 2012, the "100% Product Guarantee" stated:

"**SANTA FE NATURAL TOBACCO COMPANY**

"**100% PRODUCT GUARANTEE**

"'All products manufactured by Santa Fe Natural Tobacco Company (SFNTC) (Natural American Spirit cigarettes and roll-your-own) or represented by SFNTC (Dunhill cigarettes; State Express 555 cigarettes) (collectively, 'Tobacco Products') are 100% guaranteed.'

"Retail customers may return unintentionally damaged, non-saleable and stamped Tobacco Products through their

Direct Supplier of SFNTC products. Retailers making returns to a Direct Supplier are not required to obtain authorization from SFNTC. SFNTC's Representatives will not sticker or mark Tobacco Products at retail or provide paperwork authorizing a retailer to return such Tobacco Products to their Direct Supplier. Return procedures between retailers and Direct Suppliers are solely determined by the Direct Supplier.

"Direct Suppliers may accept Tobacco Product returns from retailers for any reason and are not required to obtain SFNTC authorization in order to accept returns from retailers.

"All questions regarding our Retail Returned Goods Policy should be directed to your local SFNTC Representative or to our SFNTC Customer Care Center at (800) [redacted].

"Retailers should process Tobacco Product returns through their Direct Supplier. In the event the Direct Supplier does not process retail returns, retail customers may contact the SFNTC Customer Care Center directly for assistance. Retailers are responsible for processing and returning product to SFNTC that will not be accepted through their Direct Supplier and adhering to all requirements of the SFNTC Retail Returned Goods Policy."

Effective for the remainder of the subject years, the "100% Product Guarantee" stated:

"**SANTA FE NATURAL TOBACCO COMPANY**

"**100% PRODUCT GUARANTEE**

"'All products manufactured by Santa Fe Natural Tobacco Company (SFNTC) (Natural American Spirit cigarettes and roll-your-own) (collectively, 'Tobacco Products') are 100% guaranteed.'

"A retail customer may return unintentionally damaged, non-saleable and stamped Tobacco Products through its Direct Supplier of SFNTC products. A retailer making a return to a Direct Supplier is not required to obtain authorization from SFNTC. SFNTC's Representatives will not sticker or mark Tobacco Products at retail or provide paperwork authorizing a retailer to return such Tobacco Products to its Direct Supplier.

"A retailer should process Tobacco Products returns through its Direct Supplier. Return procedures between a retailer and Direct Supplier are solely determined by the Direct Supplier. If a Direct Supplier does not have a procedure and/or form for processing returns, the chart below shows the type of information a Direct Supplier may desire for a return.

"Direct Suppliers may accept Tobacco Products returns from retailers for any reason and are not required to obtain SFNTC authorization in order to accept returns from retailers.

"All questions regarding our Retail Returned Goods Policy should be directed to your local SFNTC Representative or to our SFNTC Customer Service Representative at (866) [redacted].

"In the event the Direct Supplier does not process retail returns, retail customers may contact SFNTC Customer Service directly for assistance. A retailer is responsible for processing and returning Tobacco Products to SFNTC that will not be accepted through its Direct Supplier and adhering to all requirements of the SFNTC Retail Returned Goods Policy.

| "Supplier | Custom-er Name | Store Phone/ Contact | Supplier Fax | Item Number | Returned Qty. (Cartons)" |
|-----------|----------------|----------------------|--------------|-------------|--------------------------|
|           |                |                      |              |             |                          |

Taxpayer had employees (Representative Employees) located in Oregon, who visited and solicited Oregon Retailers to carry and sell Products to adult tobacco consumers. Representative Employees were trained to, and did, inform Retailers about taxpayer's 100% Product Guarantee during sales calls.

2.   *"Wholesale Returned Goods Policy"*

Taxpayer had a Wholesale Returned Goods Policy that was part of the terms and conditions of sale of taxpayer products to Oregon Wholesalers. Relevant text, taken from a representative policy, is reprinted as part of the analysis below.

### 3.   *"DIP Agreements" with Oregon Wholesalers*

Taxpayer entered into Distributor Incentive Program (DIP) Agreements with Oregon Wholesalers. The Oregon Wholesalers were not related to Taxpayer by ownership or common control and did not solicit orders for, or sell, any of the products at issue on behalf of taxpayer. Taxpayer had no right to prohibit the Wholesalers from selling cigarettes that were manufactured by companies other than taxpayer and competitive with taxpayer's Products, or from accepting returns of cigarettes of such other companies. Taxpayer had DIP Agreements with six or seven Oregon Wholesalers at various times. Certain relevant provisions of DIP Agreements are reprinted below.

Starting July 1, 2011, the Oregon Wholesalers could not purchase taxpayer Products unless the Oregon Wholesalers entered into a DIP Agreement. The DIP Agreements included a requirement that the Oregon Wholesaler accept and process returns of Products from Oregon Retailers who purchased from the Oregon Wholesaler Products for the purpose of selling them at retail.

Taxpayer had no right to control the Oregon Wholesalers' employment or personnel decisions, the way tasks (including those related to accepting Product returns) were delegated among employees or others, or the hours or days to conduct business (including accepting Product returns). Except as allowed under the DIP Agreements and the Wholesale Returned Goods Policy, taxpayer had no right to monitor how the Oregon Wholesalers fulfilled orders placed by Oregon Retailers or how the Oregon Wholesalers performed the task of accepting returns of Products from Oregon Retailers. As provided in the DIP Agreements, taxpayer had the right to conduct physical counts of the Oregon Wholesalers' inventory of Products. However, taxpayer did not send taxpayer employees to conduct such counts during the subject years.

Pursuant to the DIP Agreements, the Oregon Wholesalers reported data to a third party that included the amount of Product that the Oregon Wholesalers sold to Oregon Retailers and the amount of Product that Oregon

Retailers returned to the Oregon Wholesalers. Those data indicate the following:

| Subject Year[5] | Cartons[6] Sold by Oregon Wholesalers to Oregon Retailers | Cartons accepted by Oregon Wholesalers from Oregon Retailers | Cartons Accepted by Taxpayer from Oregon Wholesalers |
|---|---|---|---|
| **2010 Period** | 586,041 | 1,825 | 503 |
| **2011 Period** | 668,062 | 1,769 | 503 |
| **2012 Period** | 704,772 | 2,289 | 503 |
| **2013 Period** | 764,464 | 1,993 | 503 |

In accepting returns of Products from Oregon Wholesalers, taxpayer did not distinguish between Products that were returned by an Oregon Retailer to an Oregon Wholesaler, and those that were not.

B.  *Facts Related to "Pre-Book Orders"*

Taxpayer's Representative Employees did not carry inventory for sale. They sometimes took "Pre-Book Orders," which were orders authorized by an Oregon Retailer that a Representative Employee forwarded to an Oregon Wholesaler. For example, if, during a visit to an Oregon Retailer, a Representative Employee observed that the Oregon Retailer's stock of Products was low or depleted, or if the Representative Employee made a cold call on a new Oregon Retailer, the Representative Employee could leave a "sell sheet order" with the Retailer as a suggestion for the Retailer to use to purchase Products when the Retailer next visited the Oregon Wholesaler. Alternatively, the Representative Employee could take a Pre-Book Order during the visit and forward it to an Oregon Wholesaler. During the Years at Issue, Representative Employees primarily forwarded Pre-Book Orders by fax, but they could do so by phone or email, or by accessing the Oregon Retailer's electronic ordering system.

---

[5] The "periods" shown correspond closely, although not precisely, with the calendar year.

[6] A "carton" contained 10 "packs" of cigarettes.

The DIP Agreements included a requirement that the Oregon Wholesaler "accept and process" Pre-Book Orders. During the Years at Issue, Representative Employees placed an average of 13.3 Pre-Book Orders a month for Oregon Retailers.

The parties agree that Pre-Book Orders were not sales by taxpayer to Oregon Retailers. The Oregon Wholesaler, not taxpayer, fulfilled the order from the Wholesaler's own inventory and billed the Oregon Retailer for the Products after Representative Employees placed the Pre-Book Orders by forwarding them to the Oregon Wholesaler.

C.  *Procedural Background*

Taxpayer timely filed Oregon corporation excise tax returns for each of the Years at Issue and paid only the annual $150 minimum tax imposed under ORS 317.090. Taxpayer reported no Oregon taxable income, based on taxpayer's determination that PL 86-272 immunized its income from Oregon's net income tax imposed under ORS 317.070. Taxpayer attached to each return a page containing a large-font statement: "The taxpayer's activities in this state are limited to the solicitation of sales and are therefore protected by Public Law 86-272." The department audited taxpayer's returns, concluded that PL 86-272 did not protect taxpayer, and after an administrative conference, issued notices of assessment of tax and interest, as well as penalties for substantial understatement of taxable income (ORS 314.402) and failure to pay tax when due (ORS 314.400). Taxpayer appealed to the Magistrate Division, which granted summary judgment in favor of the department.

Taxpayer appealed to this division from the magistrate's decision. In the stipulation, filed before trial, each party reserved the right to call an expert witness, and each party did so at a one-day trial. The evidence in the case, other than the stipulation and stipulated exhibits, consists of those portions of expert witness testimony that the court later admitted; neither party proffered exhibits at trial other than previously stipulated exhibits.

### III.   ISSUES

A.   *Returns of goods: activities of independent contractors under 15 USC § 381(c).* Did Taxpayer lose immunity under 15 USC section 381(c) because Oregon Wholesalers accepted returns from Oregon Retailers of goods manufactured by Taxpayer, including returns of salable goods that Oregon Wholesalers placed into their own inventory and returns of nonsalable goods that Oregon Wholesalers were allowed to send to Taxpayer for credit, where DIP Agreements required the Oregon Wholesalers to accept returns from Oregon Retailers regardless of reason?

B.   Pre-Book orders: "missionary" activities of Taxpayer employees under 15 USC § 381(a)(2). Did Taxpayer lose immunity under 15 USC section 381(a)(2) because Representative Employees in Oregon placed "Pre-Book Orders" with Wholesalers for shipment of Taxpayer Products to Retailers, where DIP Agreements required the Wholesalers to accept and process the Pre-Book orders?

C.   *De Minimis activities.* Did Taxpayer retain immunity because it conducted both of the foregoing activities at a *de minimis* level?

D.   *Penalties.* Do the positions Taxpayer took on its Oregon returns subject Taxpayer to the penalty under ORS 314.402(1) for "substantial understatement of taxable income"?

### IV.   ANALYSIS

Taxpayer claims immunity from Oregon corporation excise tax under PL 86-272, which provides, in pertinent part:

"(a)   No state, or political subdivision thereof, shall have power to impose, for any taxable year after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:

"(1)    the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection and, if approved, are filled by shipment or delivery from a point outside the State; and

"(2)    the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).

"* * * * *

"(c)    For purposes of subsection (a) of this section, a person shall not be considered to have engaged in business activities within a State during any taxable year merely by reason of sales in such State, or the solicitation of orders for sales in such State, of tangible personal property on behalf of such person by one or more independent contractors, or by reason of the maintenance of an office in such State by one or more independent contractors whose activities on behalf of such person in such State consist solely of making sales, or soliciting orders for sales, of tangible personal property.

"(d)    For purposes of this section—(1) the term 'independent contractor' means a commission agent, broker, or other independent contractor who is engaged in selling, or soliciting orders for the sale of, tangible personal property for more than one principle and who holds himself out as such in the regular course of his business activities; and (2) the term 'representative' does not include an independent contractor."

15 USC § 381; *see also id.* § 383 ("For purposes of this chapter, the term 'net income tax' means any tax imposed on, or measured by, net income."). Congress enacted PL 86-272 in 1959 and has never amended it.

In its pretrial memorandum, the department identifies the activities described in Issues A (return of goods) and B (Pre-Book Orders) as the bases for its position that PL 86-272 does not protect taxpayer from Oregon's net income taxes. If the court agrees with the department regarding

either issue, the court must conclude that PL 86-272 does not protect taxpayer and must uphold the assessments.

A.   *Returns of Goods*

With respect to returns of goods, the parties disagree whether, under 15 USC § 381(c), (1) the Wholesalers acted "on behalf of" Taxpayer and if so, (2) the Wholesalers' activity was within or outside the scope of "making sales, or soliciting orders for sales."[7]

1.   *Did Oregon Wholesalers accept returns "on behalf of" Taxpayer?*

The department asserts that the Wholesalers acted on behalf of taxpayer because taxpayer "delegated" to Wholesalers the activity of accepting returns from Retailers in satisfaction of taxpayer's "100% Product Guarantee" to Retailers. Taxpayer disputes that the facts show the Wholesalers acted on its behalf. Before addressing the facts, the court seeks to understand the meaning of the statutory term "on behalf of," looking to the text, structure and legislative history of PL 86-272. *See Etter v. Dept. of Rev.*, 360 Or 46, 52, 377 P3d 561 (2016); *Health Net Life Ins. Co. v. Dept. of Rev.*, 24 OTR 514 (2021). When interpreting the text of a federal statute, the job of a court "is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wisconsin Central Ltd. v. U.S.*, ___ US ___, 138 S Ct 2067, 2070-71, 201 L Ed 2d 490 (2018) (ellipses in original) (quoting *Perrin v. United States*, 444 US 37, 42, 100 S Ct 311, 62 L Ed 2d 199 (1979)).

For the ordinary meaning of a term, the court starts with contemporaneous dictionary definitions. *Cf. id.* A leading dictionary included the following definition:

> "**be·half** *** INTEREST, BENEFIT, SUPPORT – used as the object of *in* or *on* and with a possessive noun or pronoun < a good word in a friend's ~ > < the senator who is now stumping the state on his own ~ > < intervening in her ~—Warren Beck >—**in behalf of** *or* **on behalf of** *prep* : in the interest

---

[7] The parties frame their positions under 15 USC section 381(c), which covers "independent contractors." In its post-trial brief, the department acknowledged that the Oregon Wholesalers were "acting as independent contractors" under 15 USC section 381(c), rather than as "representatives" under 15 USC section 381(a).

of : as the representative of : for the benefit of < this letter is written *in behalf of* my client >"

*Webster's Third New Int'l Dictionary* 198 (una-bridged ed 1961) (typeface in original; archaic definition omitted). The court finds nothing in contemporaneous legal dictionaries suggesting a meaning different from that in *Webster's. See* James A. Ballentine, *Self-Pronouncing Law Dictionary* 88 (1948) ("The word is defined by Webster as meaning in the name of; on account of; benefit; advantage; interest; profit; defense; vindication."); *Black's Law Dictionary* 197 (4th ed 1957) ("Benefit, support, defence, or advantage."). The court concludes that the ordinary meaning of "on behalf of," as of 1959, was "in the interest of," "as representative for," or "for the benefit of."

The parties have not argued that the structure or legislative history of PL 86-272 suggests an understanding of "on behalf of" that is different from the ordinary meaning.[8] For additional context, the court has examined the cases that (according to *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 US 214, 220-22, 112 S Ct 2447, 120 L Ed 2d 174 (1992) prompted Congress to enact PL 86-272. *See Northwestern States Portland Cement Co. v. Minnesota*, 358 US 450, 454, 79 S Ct 357, 3 L Ed 2d 421 (1959); *Brown-Forman Distillers Corp. v. Collector of Revenue*, 234 La 651, 101 So 2d 70 (1958), *appeal dism'd*, 359 US 28, 79 S Ct 602, 3 L Ed 2d 625 (1959); *International Shoe v. Fontenot*, 236 La 279, 280, 107 So 2d 640 (1958), *cert den*, 359 US 984, 79 S Ct 943, 3 L Ed 2d 933 (1959). However, none of these opinions focus on whether an in-state nonemployee acted "on behalf of" an out-of-state seller. Nor do the few cases interpreting PL 86-272 that are binding on, or precedential for, this court. *Wrigley* involved the activities of sales-persons who evidently were employees. *See* 505 US at 232-33. In *Herff Jones Co. v. Tax Com.*, 247 Or 404, 410, 430

---

[8] The department discusses the structure and legislative history to the extent of arguing that 15 USC section 381(c) should be read narrowly, such that an independent contractor's engaging in any in-state activity on behalf of the out-of-state taxpayer other than making sales, or soliciting orders for sales as allowed under 15 USC section 381(a), potentially jeopardizes the taxpayer's immunity under PL 86-272. Taxpayer does not contest that reading as a general proposition, but rather argues that Wholesalers did not accept returns on taxpayer's behalf.

P2d 998 (1967), the court concluded, upon analysis, that the Oregon-resident sales personnel were not independent contractors. In *Ann Sacks Tile & Stone v. Dept. of Rev.*, 20 OTR 377, 382 (2011), *appeal dismissed on procedural grounds*, 352 Or 380, 287 P3d 1062 (2012), this court expressly assumed that plumbers performing warranty work pursuant to contracts with Kohler, Inc. (Kohler) were independent contractors. The court also implicitly concluded that the plumbers performed their work on behalf of Kohler, but the court did not discuss a basis for that conclusion. The court will apply the plain meaning of "on behalf of."

The court now examines the facts in greater detail, to determine whether the Wholesalers' activities with respect to returns amounted to activities "on behalf of" taxpayer. The department, asserting that taxpayer "delegated" to Wholesalers the activity of accepting Retailer returns, bases its position on the terms of taxpayer's Wholesale Returned Good Policy and taxpayer's DIP Agreements with Wholesalers. The Wholesale Returned Goods Policy stated that the objective of the "Wholesale Returned Goods Program" was to "establish reasonable policies regarding returning unintentionally damaged and unsalable, stamped product at the direct supplier level." Among other topics, the document instructed Wholesalers on handling goods damaged at the time the Wholesaler received them from taxpayer, and on handling goods received from Retailers:

> "In the event a case is damaged during delivery from the factory please follow the directions listed below:
>
> "1.  Direct supplier[9] must accept the damaged case.
>
> "2.  Direct Supplier must clearly indicate the type of damage as well as total damaged carton and/or packs on the carrier manifest at time of acceptance.
>
> "3.  Return ONLY damaged cartons to SFNTC Product Recovery Operations (PRO) per guidelines in this manual.
>
> "4.  Place undamaged cartons in existing inventory.

---

[9] In taxpayer's documents, "Direct Supplier" is synonymous with "Oregon Wholesaler" as defined in this order.

"In the event that direct supplier receives returned goods from retail customers, please follow the directions listed below:

"1.    Direct supplier should accept the returned, stamped product.

"2.    Direct Supplier should clearly inspect the total returned carton and/or packs returned at time of acceptance.

"3.    Direct Supplier must return ONLY damaged or unsaleable, stamped (out dated) cartons to SFNTC Product Recovery Operations (PRO) per guidelines in this manual.

"4.    Place undamaged and/or saleable stamped cartons in existing inventory."

The DIP Agreements provided, among other things:

"BY SIGNING THE DISTRIBUTOR AGREES:

"To accept and process returns for all SFNTC products. Distributor will allow their Retailers to return any SFNTC product to them regardless of reason. Saleable SFNTC products should be returned to inventory and products deemed unsalable can be returned to SFNTC for credit."

Taxpayer argues that the activity of accepting returns from Retailers is a "best practice[]" that "benefits both [taxpayer] and the Oregon Wholesaler," and that this "best practice" does not support an inference that the Wholesalers performed that activity on taxpayer's behalf. Taxpayer's legal premise seems to be that only an activity that *solely* benefits the out-of-state seller fits within the definition of an activity "on behalf of" the out-of-state seller. However, the ordinary meaning of "on behalf of" does not support that legal premise. An activity may be in the "interest" of, or may "benefit," more than one person, as when a business donates goods or services to a charitable cause and enjoys public goodwill for doing so. A person may "represent" the interests of another while also benefiting personally from the result, as when a company lobbies on behalf of the trade association of which it is a member. Even if the court assumes that Wholesalers had their own interest in

accepting returns (presumably, to maintain long-term relationships with their Retailer customers), that proves nothing about whether the Wholesalers accepted the returns on behalf of taxpayer.

Turning to the facts, the record provides no evidence to support taxpayer's assertion. Even if, as a matter of law, a finding that Wholesalers also acted in their own interests could eliminate the possibility that they acted "on behalf of" taxpayer, nothing in the record establishes that wholesalers of goods in general followed a "best practice" of accepting *all* returns of goods, salable or unsalable, and "for any reason." Nor does anything in the record allow the court to conclude that such a practice was the norm or a standard among wholesalers of other cigarette brands in Oregon during the years at issue. The only evidence of policies and practices with respect to returns is in taxpayer's own forms—the "Santa Fe Natural Tobacco Company Wholesale Goods Return Policy" and taxpayer's forms of DIP Agreement. These documents, in the absence of anything else, persuade the court that requiring the Wholesalers to accept all returns served *taxpayer's* interest and thus establish that the Wholesalers acted on taxpayer's behalf in accepting returns.

Finally, taxpayer argues that there is no evidence that any Wholesalers actually accepted any returns on taxpayer's behalf. Taxpayer starts by seeking to reduce the field of transactions in question, arguing that only returns of *nonsalable* Products arguably could have counted as returns accepted "on behalf of" taxpayer, because when Retailers returned *salable* Products to Wholesalers, the Wholesalers placed them back into their own inventory, in their own interests and for their own benefit. The court rejects this premise for the reasons discussed above: just because accepting salable Products may have benefited the Wholesalers themselves does not mean that the Wholesalers were not also benefiting, and therefore acting on behalf of, taxpayer. Taxpayer required Wholesalers to accept *all* returns, and there is no evidence they would have accepted all returns if taxpayer had not required them to.

Even if the court were to agree that only returns of nonsalable Products should count, taxpayer's argument still fails on evidentiary grounds. Taxpayer asserts that there is no evidence that any of the approximately 5,000 packs the Wholesalers returned to taxpayer each year as unsalable had been sold to Retailers and returned to the Wholesalers; for example, they might have been damaged when first received from taxpayer, or they might have become stale in a Wholesaler's warehouse, before the Wholesaler could manage to sell them to any Retailer. Therefore, according to taxpayer, the court cannot find that the Wholesalers acted as "conduits" for the return of unsalable products from Retailers to taxpayer.

Taxpayer is correct that there is no evidence in the record that tracks the progress of packs of cigarettes from Retailers, back to Wholesalers, and finally back to taxpayer; however, that lack of evidence harms taxpayer's position rather than aiding it. The parties have stipulated only that two streams of returns existed, without specifying any relation between them: Retailers returned approximately 20,000 packs of cigarettes to Wholesalers annually, and Wholesalers returned approximately 5,000 packs to taxpayer annually. Based on the stipulations, any amount, from zero to all 5,000 of the packs taxpayer received, might have been returned by Retailers. On this point, however, taxpayer bears the burden of going forward with evidence to persuade the court, and taxpayer has not carried that burden. Taxpayer contests an income tax assessment and therefore is the "party seeking affirmative relief" from that assessment. ORS 305.427. It falls to taxpayer to persuade the court of its factual position by "a preponderance of the evidence." *Id.* If the court were to accept taxpayer's legal premise that the Wholesalers acted on taxpayer's behalf only to the extent that they served as a "conduit" for returns of nonsalable products from Retailers, and if taxpayer wished to rely on the absence of any such returns to support its argument, then taxpayer would have to persuade the court of the absence of the *returns*, not just the absence of *data* going either way. If, as taxpayer asserts, Wholesalers had no interest in, or benefit from, tracking returns of nonsalable products from Retailers because they accepted all returns

solely in order to benefit their independent wholesaling businesses, then taxpayer would have to try to marshal evidence elsewhere, for example from witnesses working for Retailers, Wholesalers, or both, or possibly from statistical sampling. Taxpayer has made no such effort and has therefore failed to carry its burden of persuasion.

Taxpayer also misses the mark when it explains at some length that it did not control the manner or means by which Wholesalers accepted returns. Here, taxpayer seems to conflate the relationship of acting "on behalf of" another with the relationship of agency. The absence of a right to control might negate an agency relationship, but it does not negate the possibility of action on behalf of another. As a matter of federal statutory interpretation, the court may look to the contemporaneous common law as a source of relevant context. *See, e.g.*, *Standefer v. U.S.*, 447 US 10, 19, 100 S Ct 1999, 64 L Ed 2d 689 (1980) (construing "principal" in criminal provision of Internal Revenue Code by reference to term's "common-law background"); *Burlington Industries, Inc. v. Ellerth*, 524 US 742, 754-55, 118 S Ct 2257, 141 L Ed 2d 633 (1998) (looking to "general common law," as summarized in restatements, for meaning of "agents" in Civil Rights Act of 1964). Congress in 1959 would have understood that the elements of an agency relationship are action on behalf of the principal, control by the principal, and consent by the principal. *See Restatement (Second) of Agency* § 1 (1958) (defining "agency" as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf *and* subject to his control, *and* consent by the other so to act" (emphasis added)). Acting on another's behalf is a separate type of relationship that does not require that the other person control the actor; therefore, taxpayer's evidence that it *lacked* control over the Wholesalers does not prove that the Wholesalers were not acting on taxpayer's behalf.[10]

---

[10] Commentary in the *Restatement* explains that the relationship is something other than an agency if the element of control is lacking:

"The agency relation results if, but only if, there is an understanding between the parties which, as interpreted by the court, creates a fiduciary relation in which the fiduciary is subject to the directions of the one on whose account he acts. It is the element of continuous subjection to the will of the principal

The court concludes that, by requiring the Oregon Wholesalers to accept and process returns of all Products regardless of reason, as a condition of buying any Products from taxpayer, taxpayer obligated the Wholesalers to accept the returns on its behalf. The record is clear that Wholesalers accepted and processed approximately 20,000 packs (2,000 cartons) of Products per year returned by Retailers. Taxpayer asserts that Wholesalers would have accepted and processed some or all of these returns even if the DIP Agreement had not required them to do so, but taxpayer has not carried its burden to substantiate that assertion. The court concludes that all of the returns counted as part of the Wholesalers' activity on taxpayer's behalf.

2.   *Did the Oregon Wholesalers' acceptance of returns on taxpayer's behalf exceed "making sales, or soliciting orders for sales"?*

Taxpayer argues that, even if the Wholesalers acted on its behalf in accepting returns, their conduct remained within the bounds of "making sales," as that term is used in 15 USC section 381(c).[11] Taxpayer argues that, because section 381(c) allows independent contractors to actually make sales on behalf of the out-of-state taxpayer without jeopardizing the taxpayer's immunity, Congress logically must have intended to also allow those contractors to "reverse" those sales by accepting returns and providing refunds. And if independent contractors actually making sales on behalf of a taxpayer can accept returns, surely the Oregon Wholesalers, as independent contractors that were *not* making sales on behalf of taxpayer, can accept returns as

---

which distinguishes the agent from other fiduciaries and the agency agreement from other agreements."

*Restatement (Second) of Agency* § 1 (1958) at 8 (Comment on Section 1).

[11] Subsection (c) of 15 USC section 381 "expands the immunity of subsection (a) when the out-of-state seller does its marketing through independent contractors, to include not only solicitation of orders for sales, but also actual sales, and in addition 'the maintenance . . . of an office . . . by one or more independent contractors whose activities . . . consist solely of making sales, or soliciting orders for sales . . . .'" *Wrigley*, 505 US at 224-25 (emphasis omitted). In this case, there is no issue regarding "maintenance of an office," and taxpayer does not argue that accepting the returns was within the scope of "soliciting orders" under 15 USC section 381(c).

well.[12] A contrary conclusion would, according to taxpayer, read into section 381(c) an extraordinary requirement that "all sales must be final."

Although taxpayer frames this point as a matter of pure logic, the court must deal with the facts at hand. In this case, the DIP Agreement does not merely *allow* Wholesalers to accept returns, it *requires* them to accept *all returns* for *any reason*, in effect specifying that "*no* sales are final." As recounted above, taxpayer offers no evidence that the Wholesalers would have adopted that return policy on their own. This additional fact differs from the hypothetical scenario taxpayer proffers.[13] Therefore, the court must consider whether the Wholesalers' contractual obligation to accept all returns for any reason has significance under 15 USC section 381(c).

Neither the United States Supreme Court nor the Oregon Supreme Court has had occasion to determine a test for whether an independent contractor's activity exceeds the scope of "making sales" under 15 USC section 381(c). This court considered the issue in *Ann Sacks* and concluded that performing warranty repairs was an activity that destroyed immunity; however, that case was not heard by the Oregon Supreme Court because of a procedural flaw in the filing of the appeal. The court today will analyze this case under *Ann Sacks* but will also consider whether the activity of the Oregon Wholesalers would be "ancillary" to "making sales," by extension of the United States Supreme Court's reasoning in *Wrigley* as to activities ancillary to "soliciting orders" under 15 USC section 381(a)(2).

In *Ann Sacks*, this court considered repair work on Kohler plumbing products that was performed by plumbers referred to as "authorized service representatives" (ASRs), as well as repair work on Kohler engine and electrical generator

---

[12] Neither party argues that the Wholesalers in this case made sales on behalf of taxpayer; the parties proceed on the assumption that the Wholesalers made sales solely on their own behalf.

[13] The court expresses no view on whether an independent contractor (making or not making sales on behalf of an out-of-state taxpayer) may accept returns on its own terms and solely for its own benefit without destroying immunity for the out-of-state seller under 15 USC section 381(c).

products that was performed by distributors. 20 OTR at 378. Kohler, based outside Oregon, was the corporate parent of a federal affiliated group that included Oregon subsidiary Ann Sacks Tile & Stone, Inc. At issue was whether the repair work was protected under PL 86-272 such that the in-state property, payroll and sales of Kohler were properly excluded from the numerator of the apportionment factors for the affiliated group. *Id.* at 393; *see* ORS 314.650 (2003) (three-factor apportionment); ORS 317.715(3)(b) (2003) (members of affiliated group not treated as single taxpayer regarding taxability or composition of apportionment factors). Kohler contracted with the plumbers and distributors to make the repairs, in order to satisfy Kohler's warranty obligations under sales contracts or under federal law. *Id.* at 378-79. The court had no occasion to fashion a test to determine whether an activity is within the definition of "making sales," because the court concluded early in its analysis, based on its reading of *Wrigley*, that performing the repair work was "activity beyond the protections of PL 86-272." *Id.* at 382 (also stating that "activities such as warranty work, that serve an independent business purpose apart from the solicitation of orders for sales, do not qualify for immunity under PL 86-272."). The court found that the taxpayer in *Ann Sacks* "d[id] not appear to contest" that point. *Id.* The court went on to address Kohler's argument that the mere use of an in-state independent contractor to perform certain discrete functions should not destroy immunity, ultimately returning to the conclusion that "the statute cannot protect Kohler in this case, for the reason that the activities of the distributors and ASRs extend beyond activities allowed by the statute." *Id.* at 385-88.[14]

---

[14] This latter portion of the *Ann Sacks* decision has prompted debate regarding whether the United States Constitution imposes limitations on attributing the acts of in-state independent contractors to out-of-state taxpayers. *See* Walter Hellerstein, 1 *State Taxation* (3d ed 2022) ¶ 6.26[2][b]-[c]. Professor Hellerstein asserts that the Constitution prohibits imposition of tax "when the relationship between the [contractor and the taxpayer] is so attenuated that asserting jurisdiction over the out-of-state taxpayer on the basis of the acts of its in-state contractor would exceed even the most expansive view of 'attributional nexus.'" *Id.* at ¶ 6.26[2][b]; *see also id.* at ¶ 6.26[2][c] (applying such limitations, court would focus on "fact-sensitive inquiry into whether the 'independent contractor' is really carrying on its own business or that of its out-of-state principal" and "'whether the activities performed in the state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a

In the absence of a test under the court's own case law for what constitutes "making sales," the court now turns to *Wrigley* for guidance based on the U.S. Supreme Court's test for the "solicitation of orders." The taxpayer in *Wrigley* was an Illinois-based chewing gum manufacturer whose employees made in-person sales calls on retailers in Wisconsin. *Wrigley*, 505 US 214. The issue was whether certain of the employees' activities during these visits exceeded the scope of 15 USC section 381(a), which immunizes a taxpayer whose in-state activities are limited to the "solicitation of orders" to be approved and filled from outside the state.

The Court considered various approaches to the interpretation of PL 86-272, rejecting a "narrow[]" reading proffered by Wisconsin and *amici* consisting of other states and the Multistate Tax Commission, rejecting as well the taxpayer's "broad" interpretation as "toothless," and describing the Court's task as "simply to ascertain the fair meaning" of "solicitation of orders." *Id.* at 223-28. The Court began with dictionary definitions of "solicitation" in order to understand how the term was "commonly understood." *Id.* at 223. The Court added its conclusion that "solicitation" must include implicit proposals to sell, not merely explicit ones. *Id.* As to activities that neither explicitly nor implicitly propose a sale, the Court looked to the context supplied by the statute's opening text, which refers to the solicitation of orders, the making of sales, and the maintenance of an office as "business activities." *Id.* at 225-26. The Court found Congress's use of that term significant, because "activities" connotes "courses of conduct" rather than isolated acts. *Id.* From there, the Court reasoned that "solicitation of orders" must include "some accompanying action," such as driving to the customer's location, and even non"essential" actions such as spending the night at an in-state hotel. *Id.* at 226.

---

market in the state for sales.'") (quoting *Tyler Pipe Indus., Inc. v. Washington State Dep't of Revenue*, 483 US 232, 250, 107 S Ct 2810, 97 L Ed 2d 199 (1987) (internal citation to Washington Supreme Court decision omitted)). The court need not consider in this case whether any constitutional limitation exists or has been exceeded, as taxpayer does not argue the constitutionality of the assessment of tax.

Having examined the term "solicitation" in its common understanding and in the context of the rest of the statutory text, the Court announced that a fair reading of the term includes activities "entirely ancillary" to the solicitation of orders. *Id.* at 228-29. The Court stated that the

"clear line is the one between those activities that are *entirely ancillary* to requests for purchases—those that serve no independent business function apart from their connection to the soliciting of orders—and those activities that the company would have reason to engage in anyway but chooses to allocate to its in-state sales force."

*Id.* (emphasis in original). The Court went on to state:

"Providing a car and a stock of free samples to salesmen is part of the 'solicitation of orders,' because the only reason to do it is to facilitate requests for purchases. Contrariwise, employing salesmen to repair or service the company's products is not part of the 'solicitation of orders,' since there is good reason to get that done whether or not the company has a sales force. Repair and servicing may help to increase purchases; but it is not ancillary to requesting purchases, and cannot be converted into 'solicitation' by merely being assigned to salesmen."

*Id.* at 229.

The Court, applying this test, decided that the following activities by taxpayer employees were ancillary to the solicitation of orders:

- Providing a car and a stock of free samples to the sales employees. *Id.*[15]

- The district manager's "in-state recruitment, training and evaluation of sales representatives" and the "use of hotels and homes for sales-related meetings," because these activities "served no purpose apart from their role in facilitating solicitation." *Id.* at 234.

- Sales employees' contacting the taxpayer's headquarters to mediate credit disputes between customers and the taxpayer's credit department, because

---

[15] Although stated in a separate portion of the opinion (*see Wrigley*, 505 US at 229), this court regards the Supreme Court's statement about providing a car and free samples as part of the holding.

if an on-site salesperson had not done this, no other employee of the taxpayer would have performed this task. *Id.* at 235 ("It hardly appears likely that this mediating function between the customer and the central office would have been performed by some other employee—some company ombudsman, so to speak—if the on-location sales staff did not exist."). The only purpose of this conduct was to ingratiate the sales employee with the customer, thereby facilitating requests for purchases. *Id.* at 234-35.

By contrast, the Court determined[16] that the following activities were not ancillary to the solicitation of orders:

- Replacing stale gum at no cost to the retailer. *See id.* at 233. The court concluded that the taxpayer "would wish to attend to the replacement of spoiled product whether or not it employed a sales force." *Id.* The Court rejected the taxpayer's argument that gum replacement was a "'promotional necessity' designed to ensure continued sales," stating that "it is not enough that the activity facilitate *sales*; it must facilitate the *requesting of sales*, which this did not." *Id.* (internal quotations omitted; emphasis in original).

- Providing 15 to 20 dollars' worth of gum to a retailer occasionally,[17] in order to fill new display racks the sales employee provided and set up for the retailer. *See id.* at 218. The sales employee gave the retailer a receipt known as an "agency stock check" and arranged for the local wholesaler to bill the retailer for the amount provided. *Id.* The fact that "Wrigley *made the retailers pay for the gum*" gave this activity

---

[16] The Court also stated that using sales employees to repair or service the taxpayer's products is not part of the solicitation of orders, and the Court cited with approval the Oregon Supreme Court's conclusion in *Herff Jones Co. v. State Tax Commission*, 247 Or 404, 412, 430 P2d 998 (1967) that sales representatives' collection activities exceeded the protection of PL 86-272. *See Wrigley*, 505 at 229-30. However, this court regards these statements as *dicta* because neither repairs or servicing of products, nor collection activities, were at issue in *Wrigley*.

[17] Any one sales representative might do this once a month in total in the course of calling on multiple retailers.

a purpose independent of soliciting orders. *Id.* at 234 (emphasis in original).

- The storage of fresh gum, and of stale, swapped-out gum awaiting disposal, primarily at the homes of the sales representatives, in connection with gum replacement and "agency stock check" activities. *See id.*

The first conclusion this court draws from *Wrigley* is that the Supreme Court expressly limited its holding to the "solicitation of orders," which was the only activity permitted under the portion of PL 86-272 that was at issue in the case, 15 USC section 381(a). The Court distinguished activities that "facilitate the *requesting of sales*" (a protected category of activities) from "activit[ies that] facilitate sales," (an unprotected category when conducted by employees), *Id.* at 233 (emphasis in original); *see also id.* at 227 (rejecting a taxpayer-proffered "customarily-performed-by-salesmen" standard because such a standard would embrace more than the "particular activity ('solicitation')"). For that reason, this court does not automatically conclude that an activity that the Court characterized as ancillary (or not ancillary) to the solicitation or requesting of orders must likewise be ancillary (or not ancillary) to the making of sales.

Second, this court concludes that the appropriate approach to resolve the issue of Product returns in this case is to follow the analytical path laid out in *Wrigley*. As relevant to this case, the common understanding of "sale," when Congress enacted PL 86-272 in 1959, was

"the act of selling : a contract transferring the absolute or general ownership of property from one person or corporate body to another for a price (as a sum of money or any other consideration) *specif* : a present transfer of such ownership of and title to all of or a part interest in personal property (as existing identifiable movable and tangible or fungible goods) under a contract by the seller to the buyer for a price paid or payable in money or other personal property— distinguished from *gift* "<arranged the *sale* of a large estate to a syndicate of home builders>"

*Webster's Third New Int'l Dictionary* 2003 (unabridged ed 1961).[18] As of that time, state legislatures were beginning to adopt the Uniform Commercial Code, which similarly defined a "sale" of goods as "the passing of title from the seller to the buyer for a price ***." Uniform Laws Annotated, Uniform Commercial Code § 2-106; *see also, e.g.,* Conn Pub Act No. 133, § 2-106, 1959 Public Acts at 237. The court concludes that the common understanding of "sale" was entering into a contract to transfer ownership of property for a price.

Turning to the context supplied by the statute's remaining text, the court follows *Wrigley* in concluding that

----

[18] The full definition at that time read:

"**1:** the act of selling **:** a contract transferring the absolute or general ownership of property from one person or corporate body to another for a price (as a sum of money or any other consideration) *specif* **:** a present transfer of such ownership of and title to all of or a part interest in personal property (as existing identifiable movable and tangible or fungible goods) under a contract by the seller to the buyer for a price paid or payable in money or other personal property —distinguished from *gift* <arranged the *sale* of a large estate to a syndicate of home builders>.

"**2:** exhibition for selling **:** the status of being purchasable—usu. used in the phrases *for sale* and *on sale* <put a house up for *sale*> <on *sale* at most stationery stores>

"**3a:** opportunity of selling or being sold **:** demand, market <counting on a large *sale* for their latest publication>

"**b:** distribution (as of goods or services) by selling <the average total *sale* for books in this category — *Saturday Rev.*>

"**4:** public disposal to the highest bidder **:** auction <art dealers flocking to the *sale* of a famous collection of early Renaissance masters>

"**5a:** a selling off of goods (as surplus or shopworn stock) at bargain prices <a clearance *sale*> <rummage *sale*>

"**b:** an advertised disposal of marked-down goods <a dress bought at a department-store *sale*>

"**6 sales** *pl*

"**a:** operations and activities involved in promoting and selling goods or services <a *sales* department> <vice-president in charge of *sales*>

"**b:** gross receipts <*sales* were over five million dollars>"

*Webster's Third New Int'l Dictionary* 2003 (unabridged ed 1961).

A contemporaneous legal dictionary defined "sale" in pertinent part

"as a transfer of the property in a chattel for a consideration. To constitute a sale in its broader sense, the price need not necessarily be money, but if the property is sold for a fixed money price, whether it be paid in cash or in goods, it is a sale. In its more strict sense, a sale is a transfer of the absolute or general property in a thing for a price in money, which the buyer pays or promises to pay for the thing bought and sold."

James A. Ballentine, *Self-Pronouncing Law Dictionary* 754 (1948).

Congress intended "making sales" as an "activit[y]." *Wrigley*, 505 US at 225-26.[19] This means that "making sales," like "solicitation," must be viewed as part of a course of conduct that includes more than simply giving the oral or written statement of assent to an offer required to enter into a contract. *See Wrigley*, 505 US at 227. Continuing the focus on *Wrigley*, the court observes that most of the in-state activities that the Supreme Court treated as ancillary to solicitation helped to prepare the employee representatives for solicitation: providing them with cars, free samples, and a temporary location at a hotel to be hired and trained. The other ancillary activity was the representatives' intervention in credit disputes, which the Court found was a task that Wrigley would not have bothered to assign to anyone else if the sales representative had not done it. By contrast, replacing stale gum for free, and making small-dollar, on-the-spot sales to fill out a display (and the storage of the gum used to do these things) were not ancillary to solicitation.

In this case, requiring Wholesalers to accept all returns for any reason is not a behind-the-scenes, preparatory activity like providing basic tools (a car, or free samples) and training. And the evidence in this case shows that Taxpayer had a keen interest in its methodically publicized 100% Product Guarantee, which announced the same return policy found in the DIP Agreement. In contrast to mediating one-off credit disputes, which Wrigley apparently found too insignificant to delegate to "some company ombudsman," the court finds it likely that taxpayer would have found another

---

[19] The court notes that the majority in *Wrigley* did not comment on the legislative history of PL 86-272. This court has reviewed the committee reports and the statements on the Senate floor leading up to the enactment of PL 86-272. In those materials, members of Congress or their staff used the term "making sales" to mean concluding or consummating a contract, in contrast to "soliciting orders," which stopped short of concluding a contract. *See, e.g.*, S Rep No 86-658 at 2554 (Aug 11, 1959) (immunity preserved even if independent contractor "also accepts the orders on behalf of that company and thereby binds the company to the contracts of sale"); 105 Cong Rec (Senate) 17834 (Sept 3, 1959) (statements of Sens. Javitz and Byrd) (independent contractor may "conclude the contract" in the state, need not have "orders accepted" outside the state); *see also* 105 Cong Rec 16354 (Aug 19, 1959) (statement of Sen. Byrd) (salesman "could not consummate a sale within the State"); Conf Rep 86-1103 (1st Sess Sept 1, 1959). However, the court has found nothing suggesting an intention to treat an activity that is "entirely ancillary" to making sales as one that destroys immunity.

way to fulfill its return policy if the Wholesalers had been unwilling or unable to do so.[20]

### 3. *Conclusion as to returns of goods*

Applying *Wrigley*'s analytical approach to 15 USC section 381(c), and in the absence of evidence that the Wholesalers would have accepted all returns for any reason if the DIP Agreement had not required them to do so, the court concludes that the Wholesalers' acceptance of returns was not ancillary to "making sales" and thus destroyed taxpayer's immunity from Oregon corporation excise tax.

## B. *Pre-Book Orders*

Independent of the return of goods issue, the department asserts that, by taking Pre-Book Orders from Oregon Retailers and forwarding them to Oregon Wholesalers for fulfillment, the Representative Employees engaged in an activity that exceeded the protection of PL 86-272. Taxpayer argues that this activity was protected "missionary"[21] activity under paragraph (2) of 15 USC section 381(a), and that it was "ancillary" to the solicitation of orders as allowed under *Wrigley*.

### 1. *Department's argument: Placing Pre-Book Orders amounted to making sales*

The department relies heavily on the position that Pre-Book Orders constituted actual sales on behalf of the Oregon Wholesalers because the DIP Agreements required Oregon Wholesalers to "accept and process" Pre-Book Orders.

---

[20] The court notes its understanding of the following passage from *Wrigley*:

"Although Wrigley argues that gum replacement was a 'promotional necessity' designed to ensure continued sales, Brief for Respondent 31, it is not enough that the activity facilitate *sales*; it must facilitate the *requesting of sales*, which this did not."

505 US at 233. This court does not read the foregoing as an affirmative statement that replacing stale gum facilitates sales, and therefore would have been "ancillary" to "making sales" under 15 USC section 381(c) if independent contractors had been involved. The Court merely rejected the taxpayer's argument as to "solicitation" under 15 USC section 381(a).

[21] The parties ultimately agree that 15 USC section 381(a)(2) would protect taxpayer's use of representatives to solicit orders from Retailers on behalf of Wholesalers, and that those activities commonly are referred to as "missionary activities." The disagreement is over whether the activities of taxpayer's representatives exceeded the "solicitation of orders."

From this premise, the department argues that the taking and placement of Pre-Book Orders went beyond the "solicitation of orders" under the plain language of PL 86-272; was not a protected "ancillary" activity under *Wrigley*; and constituted "intrastate" or "domestic" commerce under case law predating PL 86-272, which the legislative history shows Congress intended to leave undisturbed. As discussed below, the court concludes that the record does not establish the department's premise; therefore, the court expresses no view on the department's follow-on arguments.

The department seems to interpret the undefined term "accept" in the DIP Agreements in a particular legal sense, namely that the Pre-Book Order constituted an offer by the Retailer (assisted by the Representative Employee) to the Wholesaler to purchase Products, and a contract was formed automatically because the DIP Agreement prohibited the Wholesaler from doing anything other than accepting that offer. *See Black's Legal Dictionary* 12 (8th ed 2004) (defining "acceptance" as "assent * * * to the terms of an offer in a manner authorized or requested by the offeror, so that a binding contract is formed"). The court agrees that this is one possible meaning of "accept"; however, the DIP Agreement admits other possible interpretations of that term. The DIP Agreements were governed by North Carolina law, which, like Oregon law, looks to the plain meaning of terms as the starting point to interpret a contract. *See Singleton v. Haywood Elec. Membership Corp.*, 357 NC 623, 629, 588 SE2d 871 (2003) ("Where a [contract] defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect.") (internal quotation omitted). Under North Carolina case law, "[d]ictionaries can be used to determine the common and ordinary meaning of words and phrases." *Marcuson v. Clifton*, 154 NC App 202, 204, 571 SE2d 599 (2002) (internal quotation omitted). The ordinary meaning of "accept" does include a sense similar to the *Black's* definition: "to make an affirmative or favorable response to (as an invitation or offer)." *Webster's Third New*

*Int'l Dictionary* 11 (unabridged ed 2002). However, other senses include "to regard as proper, suitable, or normal" and "to receive with consent ***." *Id.* at 10-11.[22] If one of the latter two senses were to apply, "acceptance" would merely require the Wholesaler to "receive" Pre-Book Orders and to treat them as "properly" submitted.

Such an alternative reading seems consistent with the full text of the DIP Agreement's provision on Pre-Book Orders, which states that the Wholesaler:

> "agrees to *** [a]ccept and process pre-book orders initiated by SFNTC on behalf of their retail accounts. These pre-books will be in the form of hard copy, fax, and/or email."

The court finds it reasonable to read the first sentence as requiring the Wholesaler to treat a Pre-Book Order the same as any other order from the Retailer, even though a

---

[22] The full definition, omitting obsolete senses, reads:

"**2a:** to receive with consent (something given or offered) <accepted the medal> **:** assent to the receipt of <accepted lower wages>

"**b:** to be able to take or hold or be designed to take or hold (something applied, affixed, or impressed) <a glazed surface that will not accept ink>

"**3:** to give admittance to (as into one's company or into a particular group) <the town's best families accepted her> **:** give approval to<those people will never accept abstract sculpture>

"**4a:** to take without protest **:** endure or tolerate with patience <queueing is one aspect of English life he will never wholly accept —*London Calling*>

"**b:** to regard as proper, suitable, or normal <it came to be accepted that there should be universal education> **:** acknowledge or recognize as appropriate, permissible, or inevitable **:** agree to <refused to accept the dangerous working conditions —P. E. James>

"**c:** to regard and hold as true **:** believe in <by accepting the proposition that all humans are created equal>

"**d:** to receive into the mind **:** understand <words mean . . . what we accept them as meaning —J. L. Lowes>

"**5a:** to make an affirmative or favorable response to (as an invitation or offer) <accepting an invitation to speak> **:** undertake the responsibility of (as a task or employment) <if he accepts a junior partnership in the firm>

"**b:** to allow (a train) onto the particular section of a line under local control — used of a block operator in the manual block-signal system

"**6:** to assume orally, in writing, or by conduct an obligation to pay <accepting a bill of exchange> also **:** to take (something) in payment <a store that doesn't accept credit cards>"

*Webster's Third New Int'l Dictionary* 10-11 (unabridged ed 2002).

Pre-Book Order comes from a person not employed by the Retailer. The second sentence can reasonably be read to override any requirement Wholesalers otherwise might impose on Retailers to use specific software or other procedures for ordering, allowing the Representative Employee to place Pre-Book Orders by hard copy, fax or email.[23] Finally, the fact that the provision specifically requires the Wholesaler to "process" Pre-Book Orders supports a fair reading that the placing of an order did not, by itself, oblige the Wholesaler to fulfill the order; if it did, there would be no need to specify that the Wholesaler must undertake the intermediate step of "process[ing]" the order.

The court does not here determine any specific meaning of "accept," as that term is used in the DIP Agreement. The court concludes only that the term may be ambiguous and that the parties did not necessarily intend it to have the meaning on which the department relies for its position that Representative Employees were "making sales" for Oregon Wholesalers.[24] Accordingly, the court rejects as unpersuasive the department's argument that any immunity taxpayer enjoyed under PL 86-272 was destroyed by the actual making of sales by Representative Employees on behalf of Oregon Wholesalers.

  2.   *Did Placing Pre-Book Orders exceed "solicitation of orders"?*

The court proceeds to analyze whether the taking and forwarding of Pre-Book Orders by Representative Employees nevertheless exceeded the protection of PL 86-272, even if those activities did *not* amount to the actual making of sales. The court applies the test in *Wrigley*, asking whether the activities are "entirely ancillary" to the solicitation of orders because they "serve no independent business function apart from their connection to the soliciting of

---

[23] As described in taxpayer's training materials: "Many accounts use some form of cigarette ordering system."

[24] The court also notes that the DIP Agreement purports to give taxpayer wide latitude to interpret terms. In addition to an integration clause and a prohibition against parol evidence, the agreement states: "All issues arising from the DIP including, but not limited to, interpretation or application of the DIP Rules and Procedures and Reporting Requirements will be resolved by SFNTC in its sole discretion."

orders," or whether instead they constitute "activities that the company would have reason to engage in anyway but chooses to allocate to its in-state sales force." *Wrigley*, 505 US at 228-30.

The court starts by focusing on what Representative Employees actually did when they placed Pre-Book Orders, and what legal significance their actions had. The DIP Agreement contemplates that the Representative Employees "initiate[]" orders "on behalf of" a Retailer. The parties have stipulated that the Retailer "authorized" the orders, and that the Representative Employee "forwarded" them to the Wholesaler. A "Prebook Order Form" that taxpayer produced to the department in response to a discovery request for training materials shows a line for "Buyer Signature," in addition to a line for the name and phone number of the Representative Employee. Although Representative Employees could place PreBook Orders by phone, they primarily did so by fax. There is no disagreement that the Retailer "signed and authorized" Pre-Book Orders. Therefore, the court finds that the activity of Representative Employees consisted of reducing to writing the Retailer's oral shopping list during a sales call, obtaining the Retailer's signature, and delivering that list to the Wholesaler.

Taxpayer characterizes its Representative Employees' forwarding of PreBook Orders as a "ministerial" act, which taxpayer claims is "ancillary" to soliciting orders. The court agrees that the activity is clerical, as the Retailer's signature leaves no room to conclude that the Retailer had delegated any authority to the Representative Employee to decide what Products to order. But the fact that the Representative Employees had no special authority does not necessarily make their activity ancillary to the solicitation of orders. The question is whether the activity is something that taxpayer would have had reason to engage in anyway, apart from soliciting orders.

The record shows that Retailers sometimes failed to follow through on their stated intentions to buy Products.[25]

---

[25] Taxpayer's "Account Executive Guide" distinguishes a Pre-Book Order from a "sell sheet order," which the Retailer had to send to a Wholesaler on its

Taxpayer trained its Representative Employees to use Pre-Book Orders to overcome this problem, and taxpayer assigned a "specific prebook goal" to each account executive, specifying in its training materials that

"only valid prebooks can be counted towards that goal.

"All of the following are considered valid prebooks:

"•   You fill out a prebook form and fax / e-mail it to the wholesaler.

"•   You (or the store manager) enter the order into the order book or electronic ordering system (e.g., Telxon).

"•   You call the wholesaler and place the order over the telephone.

"•   You see in APEX that the retailer *placed* the order you recommended *the last time* you were in the account. (Only actual orders can be counted.)

"A verbal agreement from the retailer is not a prebook!"

The court finds that addressing Retailers' failure to follow through was something taxpayer had reason to do apart from soliciting orders. The Supreme Court has defined "soliciting" an order as "[a]sking \*\*\*, enticing \*\*\*, request[ing] or plea[ding] \*\*\* or begging" the Retailer for an order. *Wrigley*, 505 US at 223 (quoting dictionary definitions of "solicit"; internal quotations omitted). Yet the record strongly implies that even seemingly successful solicitation could be in vain if a Retailer who agreed to an order later turned out to be forgetful, distracted, or insincere. Writing down and forwarding the order for the Retailer on the spot made the difference between a potentially meaningless oral "yes" and an actual order that was more likely to result in

---

own, using a form that the Representative Employee would leave behind at the end of the sales call:

"A sell sheet order is not a guaranteed order like a prebook—it is a *suggestion* left by you for the retailer. It is up to the retailer to follow through and purchase the product. You should only use a sell sheet order if you are 100% sure that the retailer will purchase the product on his / her next visit to the wholesaler. Prebooks are always preferable, as they ensure the order will be placed."

a sale. The court thus disagrees with taxpayer's argument that "the ministerial act of sending a fax is ancillary to solicitation because there is no independent business reason to send a Pre-Book Order to an Oregon Wholesaler other than because the Pre-Book Order was just requested."

### 3.  *Conclusion as to Pre-Book Orders*

The record shows that taxpayer "allocated" to the representatives the task of facilitating the *placement* of orders by means of the Pre-Book Order process. This task served an independent business purpose for taxpayer and thus destroyed taxpayer's immunity from Oregon corporation excise tax.[26]

### C.   De minimis *Analysis*

The Court in *Wrigley* recognized that "a particular in-state activity" other than solicitation of orders may be sufficiently *de minimis* to avoid loss of the tax immunity conferred by PL 86-272, depending on whether that activity "establishes a nontrivial additional connection with the taxing State." *Wrigley*, 505 US at 232. Although the Court framed the test in the singular, it applied the test to all of Wrigley's nonimmune activities "taken together." *Id*. at 235. The combination of circumstances that destroyed immunity for that taxpayer consisted of (1) maintaining an in-state stock of fresh gum "worth several thousand dollars"

---

[26] The court does not rely on the temporal relationship between soliciting an order and placing it. At one point, Taxpayer cites a discussion in *Wrigley* in which the Court rejected a pre- vs. post-*sale* distinction, at least as a blanket test for all activities, on the grounds that merchants typically have ongoing relationships that make it difficult to tell when an activity facilitates an order already agreed to or the solicitation of the next one. *See Wrigley*, 505 US at 230-31 (stating in dicta that "[a]ctivities that take place after a sale will ordinarily not be entirely ancillary" but finding a blanket pre- vs. post-sale test "hopelessly unworkable"). Here, the basis for the court's conclusion is not that forwarding the order occurs after solicitation; rather, the court concludes that placing the order is a separate, necessary step on the path to a sale. It might not take long to execute, and a Representative Employee might make it happen casually as part of a routine sales call, but if it does not happen the Representative Employee (and indirectly, taxpayer) risks missing out on the order. Thus, even if placing an order for a Retailer during one sales call helps to ingratiate the Representative Employee with the Retailer for a future round of solicitation during the next sales call, it also serves the immediate and independent purpose of making an order much more likely to pan out.

to swap out for stale gum on retailers' shelves, "several hundred dollars" of which Wrigley transferred to retailers through orders memorialized by "agency stock checks"; and (2) exchanging the gum "deliberately," on a "regular and systematic" basis. *Id.* at 233 n 8, 235; *see id.* at 234 ("[T]he vast majority of the gum stored by Wrigley in Wisconsin was used in connection with stale gum swaps and agency stock checks ***."). Apart from rather famously noting that "several thousand dollars per year *** is a lot of chewing gum," the Court did not announce a bright-line quantitative test in terms of the value or number of in-state goods that might exceed a *de minimis* threshold in future cases. *Id.* at 233 n 8.

In this case, the court readily concludes that each of taxpayer's activities at issue was "regular and systematic," as in *Wrigley*. Taxpayer enshrined both the acceptance of returns and the acceptance of Pre-Book Orders in the DIP Agreements with which Wholesalers were obligated to comply. Furthermore, taxpayer's training materials make clear that taxpayer set Pre-Book Order performance goals for its representatives and specified the types of orders that did and did not "count" toward those goals.

As to the numeric part of the *Wrigley* standard, taxpayer has not carried its burden of proof. The court reiterates that taxpayer has not shown the number of packs or cartons of cigarettes that Oregon Wholesalers accepted on taxpayer's behalf—the number may have been as high as 5,000 packs (500 cartons) per year or even 20,000 packs (2,000 cartons) per year. Taxpayer argues that these numbers constitute only a tiny fraction of the Wholesalers' sales during the Years at Issue, but the *Wrigley* Court expressly rejected similar comparisons in favor of relying on an absolute (if unspecified) number. *See Wrigley*, 505 US at 235 (rejecting taxpayer's argument that "'agency stock checks' accounted for only 0.00007% of Wrigley's annual Wisconsin sales"). On this record, the court finds that the number of returns that Oregon Wholesalers accepted was more than *de minimis*. With respect to the number of PreBook Orders, the record states only that the average was 13.3 *orders* per month, which taxpayer argues was trivial. However, taxpayer has the burden to show triviality in terms of the

absolute numbers of packs or dollar amounts, as determined in *Wrigley*, but taxpayer has not done so.[27] On this record, the court concludes that the number of Pre-Book Orders, of an undetermined quantity of Products, was more than *de minimis*. The court concludes that neither the acceptance of returns nor the making of Pre-Book Orders occurred at a *de minimis* level; therefore, each of those activities independently destroyed Taxpayer's immunity from Oregon corporation excise tax.

D.   *Penalties*

    The department assessed penalties for each Subject Year, including the 20-percent penalty for "substantial understatement of taxable income" pursuant to ORS 314.402(2). Taxpayer seeks relief from the substantial understatement penalty, claiming that it satisfied the requirements for each of three alternative statutory exceptions:

  (1)   Under *ORS 314.402(4)(b)(A)* "there is or was substantial authority" for taxpayer's position of immunity under PL 86-272;

  (2)   Under *ORS 314.402(4)(b)(B)* taxpayer

    a.   "adequately disclosed in the return" the relevant facts regarding its position of immunity, and

    b.   "there is a reasonable basis" for taxpayer's position; or

  (3)   Under *ORS 314.402(6)* the Department improperly failed to waive the penalty based on taxpayer's showing that it acted with "reasonable cause" and "in good faith."

---

[27] The court rejects taxpayer's additional argument that the ministerial nature of the act of forwarding Pre-Book Orders necessarily makes that activity *de minimis*. The court has already concluded that the activity had an independent business purpose that made sales more likely. It was important enough that taxpayer created specific forms and procedures for Representative Employees to use, referred to it numerous times in training materials, and even created a specific role-play training session that culminated with the scripted line: "How about if I pre-book these styles through your wholesaler for you today, and make a small upward adjustment in your order book to the few styles of NAS to ensure that you are not losing out on business and revenue. What do you think?"

The department has promulgated an administrative rule that defines key terms in these exceptions. *See* OAR 150-314.402(4)(b) (2013) (currently codified, without substantive amendment, as OAR 150-314-0209). The department's rule, in turn, adopts by reference certain definitions in Treasury regulations. OAR 150-314.402(4)(b)(1) (2013) ("'Substantial authority' has the same meaning as used in Treasury Regulation 1.6662-4(d). *** 'Reasonable basis' has the same meaning as used in Treasury Regulation 1.6662-3(b)(3)."). The referenced federal regulations were last amended in 2003 and thus are the same today as during the Years at Issue.

Treas Reg § 1.6662-4(d) discusses "substantial authority," stating, in part:

> "The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50–percent likelihood of the position being upheld), but more stringent than the reasonable basis standard as defined in § 1.6662–3(b)(3).

> "*****

> "There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment.

> "*****

> "The weight accorded an authority depends on its relevance and persuasiveness, and the type of document providing the authority. For example, a case or revenue ruling having some facts in common with the tax treatment at issue is not particularly relevant if the authority is materially distinguishable on its facts, or is otherwise inapplicable to the tax treatment at issue. An authority that merely states a conclusion ordinarily is less persuasive than one that reaches its conclusion by cogently relating the applicable law to pertinent facts. *** The type of document also must be considered. For example, a revenue ruling is accorded greater weight than a private letter ruling addressing the same issue. An older private letter ruling, technical advice

memorandum, general counsel memorandum or action on decision generally must be accorded less weight than a more recent one. Any document described in the preceding sentence that is more than 10 years old generally is accorded very little weight. However, the persuasiveness and relevance of a document, viewed in light of subsequent developments, should be taken into account along with the age of the document. There may be substantial authority for the tax treatment of an item despite the absence of certain types of authority. Thus, a taxpayer may have substantial authority for a position that is supported only by a well-reasoned construction of the applicable statutory provision.

"*****

"[O]nly the following are authority for purposes of determining whether there is substantial authority for the tax treatment of an item: Applicable provisions of the Internal Revenue Code and other statutory provisions; proposed, temporary and final regulations construing such statutes; revenue rulings and revenue procedures; tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; court cases; congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers; General Explanations of tax legislation prepared by the Joint Committee on Taxation (the Blue Book); private letter rulings and technical advice memoranda issued after October 31, 1976; actions on decisions and general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre–1955 volumes of the Cumulative Bulletin); Internal Revenue Service information or press releases; and notices, announcements and other administrative pronouncements published by the Service in the Internal Revenue Bulletin. Conclusions reached in treatises, legal periodicals, legal opinions or opinions rendered by tax professionals are not authority. The authorities underlying such expressions of opinion where applicable to the facts of a particular case, however, may give rise to substantial authority for the tax treatment of an item. Notwithstanding the preceding list of authorities, an authority does not continue to be an authority to the extent it is overruled or modified, implicitly or explicitly, by a body with the power to overrule or modify the earlier authority. In the case of court

decisions, for example, a district court opinion on an issue is not an authority if overruled or reversed by the United States Court of Appeals for such district. However, a Tax Court opinion is not considered to be overruled or modified by a court of appeals to which a taxpayer does not have a right of appeal, unless the Tax Court adopts the holding of the court of appeals.

"Similarly, a private letter ruling is not authority if revoked or if inconsistent with a subsequent proposed regulation, revenue ruling or other administrative pronouncement published in the Internal Revenue Bulletin."

Treas Reg § 1.6662-3(b)(3) addresses "reasonable basis":

"Reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim. If a return position is reasonably based on one or more of the authorities set forth in § 1.6662–4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662–4(d)(2). (See § 1.6662–4(d)(3)(ii) for rules with respect to relevance, persuasiveness, subsequent developments, and use of a well-reasoned construction of an applicable statutory provision for purposes of the substantial understatement penalty.) In addition, the reasonable cause and good faith exception in § 1.6664–4 may provide relief from the penalty for negligence or disregard of rules or regulations, even if a return position does not satisfy the reasonable basis standard."

The court starts its analysis with the second of taxpayer's three arguments. ORS 314.402(4)(b)(B) provides that no "understatement" exists, and the penalty therefore does not apply, if the relevant facts are adequately disclosed and there is a reasonable basis for the taxpayer's tax treatment of the item. The court begins here because the department states in briefing that it "does not dispute that SFNTC adequately disclosed on its returns that it relied on PL 86-272," thus eliminating the need for the court to adjudicate one of the two elements of ORS 314.402(4)(b)(B). Furthermore, the

plain text of the federal regulations shows that the "reasonable basis" standard is a lower standard than the "substantial authority" test, because a position taken on a tax return may satisfy the "reasonable basis" standard "even though it may not" satisfy the "substantial authority" standard. Treas Reg § 1.6662-3(b)(3); *see* Treas Reg § 1.6662-4(d)(2) ("The substantial authority standard is less stringent than the more likely than not standard * * * but more stringent than the reasonable basis standard."). Therefore, if taxpayer's position were to satisfy the "reasonable basis" test, the substantial underpayment penalty would not apply, and there would be no need to consider whether taxpayer's position also satisfies the higher "substantial authority" standard under taxpayer's first argument. In addition, a decision in taxpayer's favor on the second argument would obviate the need to decide taxpayer's third argument, which *assumes that the penalty applies* but asks the court to decide that the department should have exercised its discretion to *waive* the penalty.

As quoted above, "reasonable basis" means something less than "substantial authority," but still a "relatively high standard of tax reporting," which is significantly higher than "not frivolous or not patently improper," and is "not satisfied by a return position that is merely arguable or that is merely a colorable claim." Treas Reg § 1.6662-3(b)(3).[28] The court sees its task as determining whether

---

[28] The adequacy of support required by a particular federal tax standard sometimes is expressed in percentage terms. The more-likely-than-not standard (required for certain tax shelter positions) is met "when there is a greater than 50-percent likelihood of the position being upheld." Treas Reg § 1.6662-4(d)(2). Regulations under *former* IRC § 6694 (2006) governing return preparers required that a return position have a "one in three" likelihood of success on the merits. Treas Reg § 1.6694-2(b)(1) (2006). Congress's Joint Committee on Taxation has reported a "general consensus of scholars and practitioners" that the substantial authority standard requires an approximately 40-percent likelihood of success and that the reasonable basis standard requires an approximately 20-percent likelihood of success. Joint Comm. on Tax'n, Study of Present-Law Penalty and Interest Provisions as Required by Section 3801 of the Internal Revenue Service Restructuring and Reform Act of 1998 (Including Provisions Relating to Corporate Tax Shelters) at 160 (Table 7) (July 22, 1999). A leading commentator on federal tax procedure states: "The cases are notoriously fact specific, but courts have found that a taxpayer has not acted negligently (and implicitly had reasonable basis) if there are unsettled areas of the law or if the issue is susceptible to honest differences of opinion. On the other hand, where the authorities are 'overwhelmingly' in the nature of the Service's position as contrasted with the

taxpayer's "return position[s are] reasonably based on one or more of the authorities" listed in Treas Reg § 1.6662-(4)(d).

The department contends that taxpayer lacked a reasonable basis for its positions that PL 86-272 immunizes the Wholesalers' acceptance of returns and the Representative Employees' placement of Pre-Book Orders. The department asserts that "no cases or administrative decisions from Oregon or other jurisdictions" offer a reasonable basis for either position, and the department cites *Wrigley*, *Ann Sacks*, and *Miles Laboratories v. Dept. of Rev.*, 274 Or 395, 546 P2d 1081 (1976) as authorities contrary to taxpayer's positions. The court finds the absence of case law neither surprising nor fatal to taxpayer's argument. The Treasury Department (including the Internal Revenue Service) does not administer PL 86-272 and thus has neither litigated the statute nor created the numerous kinds of federal administrative guidance referred to in Treas Reg section 1.6662-4. It is up to each state that imposes an income tax to enforce PL 86-272, and resource constraints on both sides doubtless limit the number of disputes in which both parties are incented to litigate to the point of a reported decision. Apparently recognizing the possibility that an issue might not have attracted the attention of courts and tax administrators, the regulations provide that "authority" on which a taxpayer may rely includes "[a]pplicable provisions of the Internal Revenue Code *and other statutory provisions*." Treas Reg § 1.6662-4(d)(3)(iii) (emphasis added). In fact, "despite the absence of certain types of authority," a "well-reasoned construction of the applicable statutory provision" may even suffice as "substantial" authority. Treas Reg § 1.6662-4(d)(3)(ii).

Regarding the Wholesalers' acceptance of returns, no case (including the three that the department cites) addresses in what circumstances an independent contractor is acting "on behalf of" an out-of-state taxpayer, and whether accepting returns may be ancillary to "making sales" for purposes of 15 USC section 381(c). *Wrigley* and *Miles Laboratories* involved activities of employees; therefore, the

---

taxpayer's position, a court will find no reasonable basis." Saltzman & Book, IRS Practice & Procedure, ¶ 7B.03.

courts had no occasion to apply 15 USC section 381(c). *Ann Sacks* involved activities of independent contractors, but the court had no occasion to determine a test for "making sales" because the court concluded that the taxpayer did not appear to contest that its warranty repair activities exceeded the protection of PL 86-272. Taxpayer's argument in this case rested on the proposition that an independent contractor, which according to the definition in 15 USC section 381(d) can sell for "more than one principal," must, as a matter of logic, possess sufficient autonomy to choose to accept returns. Taxpayer also argued that an independent contractor that does so is not acting "on behalf" of the out-of-state manufacturer because the independent contractor has its own business reason to satisfy customers wishing to return products. The court rejected these arguments, in part because the court determined that taxpayer had misinterpreted the statutory phrase "on behalf of" and had failed to analyze whether acceptance of the returns might be "ancillary" to "making sales" under an extension of *Wrigley*. Those are legal points that might fairly be described as matters of first impression. The court concludes that taxpayer's position regarding the returns was sufficiently grounded in the statutory text that it had a reasonable basis under ORS 314.402(4)(b)(B)(ii).

Regarding the Representative Employees' placement of Pre-Book Orders, after rejecting the department's argument that the Representative Employees engaged in the unprotected activity of "making sales," this court decided the issue under *Wrigley*. But the fact that the court did not interpret *Wrigley* in taxpayer's favor does not mean that taxpayer's position lacked a reasonable basis. Taxpayer asserted that placing Pre-Book Orders amounted to nothing more than the ministerial act of sending a fax for a Retailer, behavior that was "entirely ancillary" to solicitation because it merely "ingratiated" the Representative Employee with the Retailer. And as taxpayer pointed out, language in *Wrigley* cautions against treating an activity as nonancillary merely because it occurs after a sale. The court agreed that the act was likely quick, casual, and potentially ingratiating, but the court concluded that it was not ancillary to solicitation because it had the independent business purpose

of ensuring that an order the Retailer agreed to would actually be placed. Although incorrect, taxpayer's position had sufficient basis in *Wrigley* to avoid imposition of the penalty under ORS 314.402(4)(b)(B).

Because each of taxpayer's positions was reasonably based on PL 86-272 or *Wrigley*, and the department acknowledges that taxpayer satisfied the disclosure requirement, no "understatement" existed under ORS 314.402(4)(b)(B), and no penalty applies under ORS 314.402(1). The court need not address taxpayer's arguments based on "substantial authority" under ORS 314.402(4)(b)(A) or failure to waive the penalty under ORS 314.402(6).

## V.   CONCLUSION

Now, therefore,

IT IS THE OPINION OF THIS COURT that Plaintiff was not immune from Oregon corporation excise tax under 15 USC section 381 for the tax years ending December 31, 2010 through 2013; and

IT IS THE FURTHER OPINION OF THIS COURT that Plaintiff is not subject to the penalty under ORS 314.402(1).