No. 23 June 20, 2024 509

IN THE SUPREME COURT OF THE
STATE OF OREGON

SANTA FE NATURAL TOBACCO COMPANY,
*Plaintiff-Appellant,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant-Respondent.*

(TC 5372) (SC S069820)

En Banc

On appeal from the Oregon Tax Court.*

Robert T. Manicke, Judge.

Argued and submitted November 9, 2023.

Mitchell A. Newmark, Blank Rome LLP, New York, argued the cause and filed the briefs for appellant. Also on the briefs were Eugene J. Gibilaro, Blank Rome LLP, New York, and Carol Vogt Lavine, Carol Vogt Lavine, LLC, Milwaukie.

Darren Weirnick, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Dustin Buehler, Assistant Attorney General.

MASIH, J.

The judgment of the Tax Court is affirmed.

_____

\* 25 OTR 124 (2022).

**MASIH, J.**

This appeal concerns whether Santa Fe Natural Tobacco Company ("Santa Fe") is liable for Oregon income tax for tax years 2010-13. Santa Fe is a New Mexico corporation selling branded tobacco products to wholesalers, who in turn sell to Oregon retailers. The primary issue is whether a federal statutory limit on a state's ability to impose income tax on out-of-state corporations, 15 USC section 381 ("Section 381," frequently also referred to as "Public Law 86-272"), precludes Oregon from taxing Santa Fe because its business in Oregon is limited. In its simplest form, Section 381 creates a safe harbor against state income tax for out-of-state businesses that limit their in-state actions to the "solicitation of orders," provided that the orders are accepted out of state and the goods are shipped from out of state. The Oregon Department of Revenue (department) concluded that Santa Fe's various actions in Oregon had taken it outside the safe harbor of Section 381, thus rendering Santa Fe liable to pay Oregon tax. The Tax Court agreed with the department that Santa Fe's actions had made it subject to taxation in this state. *Santa Fe Natural Tobacco Co. v. Dept. of Rev.*, 25 OTR 124, 165 (2022).[1]

Santa Fe has appealed that decision. For the reasons that follow, we agree with the Tax Court that Santa Fe, by having its representatives take "prebook orders" from Oregon retailers, took itself outside the safe harbor of Section 381(a)(2). Accordingly, we conclude that Santa Fe is subject to tax by this state, and we affirm the judgment of the Tax Court.[2]

---

[1] Strictly speaking, the tax at issue is Oregon's corporate excise tax, rather than its corporate income tax. Those taxes are related but distinct. *See Capital One Auto Fin. Inc. v. Dept. of Rev.*, 363 Or 441, 442-45, 423 P3d 80 (2018) (so explaining). The distinction, however, does not affect the proper resolution of the issues here; the parties do not dispute that, if the federal statute applies, it protects Santa Fe against being subject to Oregon's corporate excise tax. *See* 15 USC § 383 ("For purposes of this chapter, the term 'net income tax' means any tax imposed on, or measured by, net income."). To avoid confusing shifts of terminology, we will use the term "income tax" as a shorthand throughout this opinion.

[2] We need not reach the department's other contentions or the other aspects of the Tax Court's holding, for reasons discussed at 372 Or at 526 n 12.

## I.   BACKGROUND LAW

As noted, the issue in this case involves the proper interpretation of 15 USC section 381. As explained below, Congress enacted that law because the United States Supreme Court's prior interpretation of constitutional limits on state power to tax out-of-state businesses had resulted in too much uncertainty. We begin by summarizing the circumstances that led Congress to enact that statute, then turn to an overview of the statute itself.

A.  *Prior Law Regarding State Taxation of Interstate Commerce*

The Commerce Clause of the United States Constitution gives Congress plenary authority to control state taxation of interstate commerce, but for most of the nation's existence Congress had never exercised it. Jerome R. Hellerstein, *Foreword: State Taxation under the Commerce Clause: An Historical Perspective*, 29 Vand L Rev 335, 335 (1976); *see also* US Const, Art I, § 8, cl 3 (setting out Commerce Clause). As a result, the only limits on state taxation of interstate commerce were imposed by the United States Supreme Court, mainly as "violations of the unexercised power of Congress to regulate interstate commerce." *Id.* (so noting and adding that due process and equal protection were involved to a lesser extent).[3] Up until the New Deal Era, that amounted to a simple prohibition on states taxing interstate commerce. *See* Jerome R. Hellerstein, *State Franchise Taxation of Interstate Businesses*, 4 Tax L Rev 95, 95 (1948) (noting "the traditional view that under the Commerce Clause interstate commerce may not be taxed at all").

During that earlier period, the Supreme Court had observed a distinction between "drummers" and "peddlers." Itinerant salespeople carrying goods for immediate delivery after sale were classified as "peddlers"; they were considered

---

[3] The underlying restriction comes from an aspect of the Commerce Clause. The Commerce Clause itself grants positive authority for Congress "[t]o regulate Commerce *** among the several States." US Const, Art I, § 8, cl 3. The United States Supreme Court, however, has "consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject." *Comptroller of Treasury of Maryland v. Wynne*, 575 US 542, 548-49, 135 S Ct 1787, 1794, 191 L Ed 2d 813 (2015) (internal quotation marks and citation omitted).

to be engaged in *intra*state commerce and thus subject to state taxation. Comment, *Taxation of Itinerant Salesmen*, 40 Yale LJ 1094, 1094-95 (1931) (discussing distinction and citing cases); Andrew T. Hoyne, *Public Law 86-272 - Solicitation of Orders*, 27 St Louis U LJ 171, 181-82 (1983) (same, and including more recent decisions); *see, e.g.*, *Memphis Steam Laundry v. Stone*, 342 US 389, 394 & n 12, 72 S Ct 424, 427, 96 L Ed 436 (1952) (explaining that the Court "has sustained state taxation upon itinerant hawkers and peddlers on the ground that the local sale and delivery of goods is an essentially intrastate process whether a retailer operates from a fixed location or from a wagon"). By contrast, itinerant salespeople who solicited orders for goods that would be later delivered from outside the state were classified as "drummers"; they were considered to be engaged in *inter*state commerce because they were only "drumming" up business, not selling and delivering products within the state, so they were considered immune from state and local taxation. Comment, 40 Yale LJ at 1094-95; Hoyne, 27 St Louis U LJ at 181-82; *see, e.g.*, *West Point Grocery Co. v. Opelika*, 354 US 390, 391, 77 S Ct 1096, 1097, 1 L Ed 2d 1420 (1957) (holding that "a municipality may not impose a *** tax on an interstate enterprise whose only contact with the municipality is the solicitation of orders and the subsequent delivery of goods at the end of an uninterrupted movement in interstate commerce").

That understanding of the Commerce Clause gradually changed during the twentieth century, when the Supreme Court began to allow states to tax a broader range of activities than would have been permitted by the earlier blanket protection against taxing interstate commerce. "[S]uch levies were [now] regarded as invalid only if the Court thought they subjected interstate commerce to a risk of multiple taxation not borne by local commerce." Hellerstein, 29 Vand L Rev at 337. As long as each state's tax was apportioned to reasonably measure that state's nexus with income, it was constitutional. *Id.*[4]

---

[4] The current test for the constitutionality of state taxation of interstate commerce is somewhat more complex. As the United States Supreme Court noted in *Complete Auto Transit, Inc. v. Brady*, 430 US 274, 97 S Ct 1076, 51 L Ed 2d 326, *reh'g den*, 430 US 976 (1977), the Commerce Clause does not prohibit state taxation of interstate commerce as long as "the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate

B.   *Enactment of Section 381*

Three decisions by the Court in 1959, however, led Congress to have substantial concerns about the state of the law. That year, the Court decided *Northwestern Cement Co. v. Minn.*, 358 US 450, 79 S Ct 357, 3 L Ed 2d 421 (1959), followed shortly afterward by the Court dismissing an appeal in *Brown-Forman Distillers Corp. v. Collector of Revenue*, 234 La 651, 101 So 2d 70 (1958), *appeal dismissed*, 359 US 28 (1959), and then denying *certiorari* in *International Shoe Co. v. Fontenot*, 236 La 279, 280, 107 So 2d 640 (1958), *cert den*, 359 US 984 (1959). The details of those rulings are not important here, but all three decisions effectively upheld a state's ability to tax out-of-state businesses whose in-state activities were largely limited to the solicitation of orders.[5]

Congress became concerned that the constitutional standards for when an out-of-state business could be subject to state income tax were so unpredictable that that lack of predictability would itself burden interstate commerce. *See Heublein, Inc. v. South Carolina Tax Comm'n*, 409 US 275, 280 n 5, 93 S Ct 483, 34 L Ed 2d 472 (1972) ("'Persons engaged in interstate commerce are in doubt as to the amount of local activities within a State that will be regarded as forming a sufficient "nexus," that is, connection, with the State to support the imposition of a tax on net income from interstate operations ***.'" (Quoting S Rep No. 658, 86th Cong, 1st Sess at 2-3.)). The burden of compliance could be substantial, especially for small or medium-sized businesses. They might have to "file tax returns in what may eventually be each of the 50 States as well as an unpredictable number of cities, even where the firm maintains no fixed establishment in those States and cities." HR Rep No. 936, 86th Cong, 1st Sess, at 2. That would require those businesses to

---

against interstate commerce, and is fairly related to the services provided by the State." *Id*. at 279 (summarizing prior case law). *See* Charles A. Trost, *Federal Limitations on State and Local Tax* § 2:22 (Westlaw 2d ed, updated Nov 2023) (identifying *Complete Auto Transit* as the "landmark case" on the subject).

   [5] Those decisions are reviewed briefly in *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 US 214, 220-21, 112 S Ct 2447, 120 L Ed 2d 174 (1992). Substantially more details on all three decisions are available in Brian S. Gillman, Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*: A Step out of the Definitional Quagmire of Section 381*, 78 Iowa L Rev 1169, 1171-75 (1993).

retain "legal counsel and accountants who are familiar with the tax practice of each jurisdiction." *Id.* The result would be "increases in overhead charges, in some cases to an extent that will make it uneconomical for a small business to sell at all in areas where volume is small." *Id.*

Those concerns led Congress to enact Section 381. *See Wisconsin Dept. of Revenue v. William Wrigley, Jr., Co.*, 505 US 214, 222, 112 S Ct 2447, 2453, 120 L Ed 2d 174 (1992) (so explaining); Paul E. Guttormsson, *Gumming Up the Works: How the Supreme Court's* Wrigley *Opinion Redefined Solicitation of Orders under the Interstate Commerce Tax Act (15 U.S.C. 381)*, 1993 Wis L Rev 1375, 1379-80 (1993); Paul J. Hartman, *Solicitation and Delivery under Public Law 86-272: An Uncharted Course*, 29 Vand L Rev 353, 358-59 (1976).

C.  *Relevant Provisions of Section 381*

The case before us involves Section 381(a). Section 381(a), which has two related restrictions, provides, in part:

"(a)  Minimum standards. No State * * * shall have power to impose * * * a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:

"(1)  the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and

"(2)  the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1)."

The first provision, Section 381(a)(1), generally protects an out-of-state business from taxation so long as it restricts the actions of its representatives to the solicitation of orders for sales within the taxing state. The solicitation

must stop short of closing the sale, though; the order must be accepted outside the state, and the goods must be shipped from outside the state. 15 USC § 381(a)(1); *see* Charles A. Trost, *Federal Limitations on State and Local Tax* § 10:9 (Westlaw 2d ed, Nov 2023 update) (summarizing provision).[6]

The requirement that the order be accepted outside the taxing state implies an actual decision taking place outside the state. As one commentator noted:

> "[I]n-state acts which tend to diminish the need for or make a total sham of the already highly formal out-of-state approval or rejection phase of the interstate solicitation process would seem to be properly outside the protection intended by Congress."

Berndt Lohr-Schmidt, *Developing Jurisdictional Standards for State Taxation of Multistate Corporate Net Income*, 22 Hastings LJ 1035, 1083-84 (1971).

The second provision, Section 381(a)(2), explicitly incorporates Section 381(a)(1) and functionally extends the same protections one additional step beyond direct customers. As noted, Section 381(a)(1) allows a business to solicit orders directly from customers, provided the resulting orders are accepted outside the taxing state. Though the phrasing is cumbersome, Section 381(a)(2) allows the business to *also* solicit orders from *indirect* customers—persons who will order, not from the business itself, but from the business's in-state direct customers.[7] But the business's solicitation of

---

[6] The provision bears a strong resemblance to the Supreme Court's earlier case law allowing regarding state and local taxation of "peddlers" but not "drummers."

[7] To make that abstraction more concrete: A business's direct customers may be wholesalers, while its indirect customers are retailers. Orders from the retailers go to the wholesalers, and the wholesalers in turn fill their inventory by ordering from the business. Under Section 381(a)(2), the business's representatives can solicit retailers to order from wholesalers, provided that (1) the solicitation is designed "to enable" the wholesalers to fill the orders; and (2) the *wholesalers'* orders to the business will still come within the safe harbor of Section 381(a)(1)—that is, the wholesalers' orders are approved, and the products are shipped, from outside the taxing state. *See* 15 USC § 381(a)(2); Trost, *Federal Limitations on State and Local Tax* § 10.9 (summarizing provision); *Wrigley*, 505 US at 233-34 (explaining that Section 381(a)(2) "shields a manufacturer's 'missionary' request that an indirect customer (such as a consumer) place an order, if a successful request would ultimately result in an order's being filled by a [Section] 381 'customer' of the manufacturer, i.e., by the wholesaler who fills the orders of the retailer with goods shipped to the wholesaler from out of state.").

such orders is limited to activities that "enable" the business's in-state customers to fill those orders.

Under both parts of Section 381(a), however, the statutory text requires that the business's "*only* business activities" in the taxing state fall within the scope of "solicitation of orders" for interstate sales. 15 USC § 381(a) (emphasis added); *see Wrigley*, 505 US at 223 (same); *Herff Jones Co. v. Tax Com.*, 247 Or 404, 412, 430 P2d 998 (1967) (same). "Solicitation of orders" stops short of the business making sales. *See* 15 USC § 381(c) (which permits independent contractors not only to solicit orders, but also to make sales); *Wrigley*, 505 US at 229 n 5 (noting that the "activities that are most clearly *not* immunized by the statute" include "actual sales" (emphasis in original)). Although *de minimis* violations will not take a business outside the protections of Section 381(a), *see Wrigley*, 505 US at 231, the statute protects a business whose activities are limited to "solicitation of orders" alone. That is the point on which this case turns: whether the in-state actions of Santa Fe's representatives went beyond the "solicitation of orders."

D.   *Limits on "Solicitation of Orders"*

The meaning of the term "solicitation of orders," as used in Section 381(a), has been one of the most difficult issues for courts attempting to interpret that statute. Prior to the Court's decision in *Wrigley*, the state courts had offered various interpretations. *See* Guttormsson, 1993 Wis L Rev at 1381-85 (reviewing state court cases to date). This court had addressed the issue more than once. *See Herff Jones Co.*, 247 Or at 411-12 (discussing "broad interpretation" seemingly adopted in *Smith Kline & French v. Tax Com.*, 241 Or 50, 403 P2d 375 (1965), but later rejected by *Cal-Roof Wholesale v. Tax Com.*, 242 Or 435, 410 P2d 233 (1966)).

In *Wrigley*, the United States Supreme Court interpreted the term "solicitation of orders" in detail. Because that interpretation guides our decision in this case, we discuss the facts and the Court's opinion in that case in some detail.

William Wrigley, Jr., Co., a gum manufacturer, was headquartered in Chicago, but it sent sales representatives

into Wisconsin. 505 US at 216. The Supreme Court had to determine whether actions taken by Wrigley's representatives exceeded the safe harbor of Section 381(a). It concluded that they did. *Id.* at 232-33.

The Court first considered what "solicitation of orders" meant as used in the statute. It began by examining the meaning of "solicitation" generally:

> "'Solicitation,' commonly understood, means 'asking' for, or 'enticing' to, something, see Black's Law Dictionary 1393 (6th ed 1990); Webster's Third New International Dictionary 2169 (1981) ('solicit' means 'to approach with a request or plea (as in selling or begging)')."

*Id.* at 223 (brackets omitted). The Court went on to conclude that "solicitation of orders" was not limited to the request for a purchase; instead, it included "the entire process associated with the invitation." *Id.* at 225. Nor was "solicitation of orders" limited to activities "essential" to the request to purchase: If the wording were limited in that way, the Court explained, then

> "it would not cover salesmen's driving on the State's roads, spending the night in the State's hotels, or displaying within the State samples of their product. We hardly think the statute had in mind only day-trips into the taxing jurisdiction by emptyhanded drummers on foot."

*Id.* at 226. Again, however, "solicitation of orders" does not include "actual sales"—which the Court described as one of the "activities that are most clearly *not* immunized by the statute." *Wrigley*, 505 US at 229 n 5 (emphasis in original).

At the same time, the Supreme Court also rejected the suggestion that "solicitation of orders" should be understood to mean whatever conduct might be considered routine or customary in the course of a solicitation. Accepting that suggestion, the Court reasoned, would

> "convert[] a standard embracing only a particular activity ('solicitation') into a standard embracing all activities routinely conducted by those who engage in that particular activity ('salesmen'). If, moreover, the approach were to be applied (as respondent apparently intends) on an industry-by-industry basis, it would render the limitations of

> [Section] 381(a) toothless, permitting 'solicitation of orders' to be whatever a particular industry wants its salesmen to do."

*Id.* at 227 (footnote omitted).

The Court instead concluded that a business activity would be a protected "solicitation of orders" as long as the *only* business purpose for the activity was to help solicit orders. The "clear line" separating a protected "solicitation" from unprotected activities was drawn

> "between those activities that are *entirely ancillary* to requests for purchases—those that serve no independent business function apart from their connection to the soliciting of orders—and those activities that the company would have reason to engage in anyway but chooses to allocate to its in-state sales force."

*Id.* at 228-29 (emphasis in original; footnote omitted).

The Supreme Court then offered some examples of how that test would apply. A business activity would not exceed the scope of the "solicitation of orders" if it involved giving a sales representative a car and a stock of samples: "the only reason to do it is to facilitate requests for purchases." *Id.* at 229. But having sales representatives repair or service the business's products would exceed the "solicitation of orders," and so would not be protected by Section 381, because

> "there is good reason to get that done whether or not the company has a sales force. Repair and servicing may help to increase purchases; but it is not ancillary to requesting purchases, and cannot be converted into 'solicitation' by merely being assigned to salesmen."

*Id.* (citing *Herff Jones* for proposition that there is "no [Section] 381 immunity for sales representatives' collection activities").

The Court then turned to the facts before it and considered whether the activities by Wrigley's representatives exceeded the scope of "solicitation of orders." Three activities were important to the Court's decision. The first two involved representatives contacting Wrigley's indirect customers—retailers—on behalf of Wrigley's direct

customers—wholesalers. *See* 505 US at 218; *William Wrigley, Jr. Co. v. Dept. of Rev.*, 160 Wis 2d 53, 64-65, 465 NW2d 800, 804 (1991), *rev'd on other grounds*, *Wrigley*, 505 US 214 (providing additional details). First, the representatives would offer free gum displays and seek to have them prominently displayed. *Wrigley*, 505 US at 218. If the retailer did not have sufficient gum in stock to fill the displays, then the representative would fill the display with a stock of gum that the representative had brought. *Id.* The retailer would be charged for the gum, however, by a mechanism—the "agency stock check"—that involved the retailer paying the wholesaler, not directly paying Wrigley. *Id.* Second, the representatives would check the retailer's stock and replace any gum that had gone stale. *Id.* at 218-19. The replacement of stale stock was done without charge. *Id.* And third, Wrigley gave its sales representatives—who resided in Wisconsin—approximately $1,000 worth of gum each to perform those two actions. *Id.* at 217-18. The Court concluded that all three of those activities exceeded the scope of "solicitation of orders."

First, the Supreme Court explained that Wrigley's representatives had exceeded the scope of "solicitation of orders" when they replaced stale gum:

> "Wrigley would wish to attend to the replacement of spoiled product whether or not it employed a sales force. Because that activity serves an independent business function quite separate from requesting orders, it does not qualify for [Section] 381 immunity."

*Id.* at 233. The Court rejected the argument that replacement was a "'promotional necessity' designed to ensure continued sales." *Id.* For an activity to be protected by Section 381's safe harbor, the Court explained, "it is not enough that the activity facilitate *sales*; it must facilitate the *requesting of sales*, which this did not." *Id.* (emphases in original; footnote omitted).

Second, the Court concluded that Wrigley's representatives had exceeded the scope of "solicitation of orders" when they placed gum into retailers' displays (the "agency stock checks"). Specifically addressing Section 381(a)(2), the Court explained that Wrigley's actions had an independent business purpose beyond mere solicitation:

> "It might seem *** that setting up gum-filled display racks, like Wrigley's general advertising in Wisconsin, would be immunized by [Section] 381(a)(2). What destroys this analysis, however, is the fact that Wrigley *made the retailers pay for the gum*, thereby providing a business purpose for supplying the gum quite independent from the purpose of soliciting consumers. Since providing the gum was not entirely ancillary to requesting purchases, it was not within the scope of 'solicitation of orders.'"

*Id.* at 234 (emphasis in original; footnote omitted). Even though the retailers were making those payments to the wholesalers and not to Wrigley directly, the payments were sufficient to take Wrigley out of the safe harbor of Section 381(a)(2).

Finally, the Court concluded that Wrigley, by storing gum in-state, also exceeded the scope of "solicitation of orders" because the vast majority of that gum was used to replace stale gum or the "agency stock checks," which were not themselves protected activities. *Id.*

With that understanding of the background of Section 381 and how it has been interpreted by the Supreme Court, we turn to the facts developed in the Tax Court regarding the scope of Santa Fe's activities in relation to wholesalers and retailers in Oregon, before explaining why those activities took Santa Fe outside of Section 381's safe harbor.

## II.   FACTS AND PROCEEDINGS

A.  *Facts*

The parties stipulated to the underlying facts. We set out below only those facts relevant to our decision, taken from the stipulation and its attached exhibits. All facts should be understood to refer to tax years 2010-13.

Santa Fe is a New Mexico corporation operating out of state. Santa Fe had no offices or inventory of its own located in Oregon.

During the relevant tax years, Santa Fe sold tobacco products only to wholesalers.[8] Wholesalers in turn

---

[8] During 2010, Santa Fe made some direct sales to Oregon retailers. The department does not rely on those sales to establish Santa Fe's tax liability. Accordingly, our analysis will proceed as though Santa Fe had not made any in-state sales during the relevant tax years.

sold Santa Fe's products to retailers; retailers then resold the products to consumers.

Santa Fe sent its employees into Oregon to persuade Oregon retailers to order Santa Fe's products from wholesalers. Many of those wholesalers were also located in Oregon. When a representative visited an Oregon retailer in person and convinced the retailer to agree to order Santa Fe's products from a wholesaler, the representative could take one of two actions.

One option was for the representative to leave the retailer a "sell sheet order." The sell sheet order forms were prepared by Santa Fe. They were captioned "Santa Fe Natural Tobacco Account Profile" and included blank spaces for the retailer's account name, number, shipping information, and Santa Fe product selection. The representative would "write the quantities of each item on the appropriate wholesaler sell sheet and leave the sheet with the retailer" for the retailer to send to the wholesaler. A sell sheet order was just a "suggestion" to buy; "[i]t is up to the retailer to follow through and purchase the product." Thus, a sell sheet order would seem to be a classic example of the type of solicitation that falls within the safe harbor of Section 381, and the department does not contend that Santa Fe's actions regarding sell sheet orders took it outside the safe harbor of Section 381.

Another option for the representative, however, was to take a "prebook order." In some ways, prebook orders were similar to sell sheet orders. Like the sell sheet order forms, the prebook order forms were also prepared by Santa Fe and had a caption at the top identifying Santa Fe rather than the wholesaler. A prebook order would also be filled out by Santa Fe's representative.

The prebook order process, however, diverged from the sell sheet order process in ways that, as we will explain, made the process more like the facilitation of sales within Oregon, rather than solicitation of orders that could be accepted or rejected by Santa Fe's Oregon wholesalers. Below the caption "Santa Fe Natural Tobacco Company Prebook Order Form," the form included the words "Sold To," "Date,"

and "Delivery Date." The prebook order form would immediately be signed by the retailer on the line labeled "Buyer Name" and "Buyer Signature." The representative would then personally send the order to the wholesaler by hard copy, phone, fax, or email/electronic delivery (but usually by fax).

When a wholesaler received a prebook order, that triggered a provision of a contractual agreement with Santa Fe: the "Distributor Incentive Program Agreements" ("incentive agreements"). As relevant here, the incentive agreements required every wholesaler to "accept and process" prebook orders. The 2011 incentive agreement, for example, provided that wholesalers must

> "[a]ccept and process pre-book orders initiated by [Santa Fe] on behalf of their retail accounts. These pre-books will be in the form of hard copy, fax, and/or email."

The other incentive agreements were functionally identical. As we will explain, the incentive agreements imposed substantial economic penalties on any wholesaler who refused to accept a prebook order.

The incentive agreements provided for wholesalers to receive incentive payments as a rebate from Santa Fe for each carton that the wholesaler sold.[9] Each of the incentive agreements provided that a breach of the agreement would be cause for Santa Fe to cease making incentive payments on cartons sold. Beginning with the 2011 version of the incentive agreement, Santa Fe's declaration of a breach would not only entitle it to discontinue future payments to the wholesaler; Santa Fe expressly had the right to require the wholesaler to *repay* all those payments already made under the incentive agreement. Santa Fe was also given exclusive discretion to determine whether a wholesaler had complied

---

[9] Under the 2010 incentive agreement, the rebate was 20 cents per carton, rising to 40 cents per carton for every carton sold beyond the previous year's sales.

Under the 2011 and 2012 incentive agreements, a wholesaler could receive up to 50 cents per carton: 20 cents credited to the invoice when the product was shipped, with additional quarterly payments of 30 cents per carton "to those [wholesalers] which fully meet *** all [incentive agreement] Rules and Procedures." Whether a wholesaler had fully met all incentive agreement rules and procedures was "to be determined by [Santa Fe] in its sole discretion."

with the terms of the incentive agreements. Moreover, a wholesaler was not permitted to purchase Santa Fe's products "unless [the wholesaler] entered into a[n] [incentive agreement]."[10]

Because the incentive agreements expressly required wholesalers to accept and process prebook orders and imposed substantial economic penalties on any wholesaler who refused to do so, Santa Fe trained its trade representatives to emphasize prebook orders, not sell sheet orders. Those materials expressly described a prebook order as "a guaranteed order." Those materials added that prebook orders "ensure the order will be placed" and "ensure that line extensions sold in [*sic*] during the sales call will be ordered and placed in distribution within the outlet/account."

Santa Fe also set a "specific prebook goal" for its trade representatives; "only valid prebooks [could] be counted towards that goal." Santa Fe's materials for its representatives directed them to "[a]lways attempt to place prebooked orders." Santa Fe had a "role play" for its representatives where the stated objective was "[t]o get a pre-book"; it concluded with the representative asking the retailer, "How about if I prebook these styles through your wholesaler for you today[?]"

During the relevant tax years, Santa Fe's trade representatives placed an average of 13.3 prebook orders per month from Oregon retailers.

In contrast to prebook orders, none of the incentive agreements addressed sell sheet orders in any way. Sell sheet orders, the materials state, are not guaranteed and are a mere "suggestion" for the retailer to order.

---

[10] The 2011 and 2012 incentive agreements were emphatic on the point:

"[The wholesaler] agrees that all of its obligations under this [incentive agreement] are material, that full performance of all of its obligations under this [incentive agreement] is essential, and that [Santa Fe] has no obligation to accept any product orders from, or make any monetary payments to, [the wholesaler] if [the wholesaler] breaches or in any way fails to perform in whole or part any provision or requirement of this [incentive agreement]."

B.  *Proceedings Below*

During the relevant years, Santa Fe timely filed Oregon tax returns. It reported no Oregon taxable income, instead asserting that its activities in Oregon fell within the protections of Section 381.

The department audited Santa Fe's tax returns and rejected Santa Fe's claimed immunity. The department assessed deficiencies for every tax year, from a low of $395,947 for tax year 2010, to a high of $771,122 for tax year 2013 (not including substantial understatement penalties and interest for each year).

Santa Fe appealed to the Regular Division of the Tax Court,[11] where the matter was tried on stipulated facts. Santa Fe argued that prebook orders were the mere solicitation of orders from indirect customers and so protected by Section 381(a)(2). Santa Fe contended that prebook orders differed from sell sheet orders only through the "ministerial act" of having Santa Fe's sales representative, rather than the retailer, transmit the order by pressing the button on a fax machine.

The department conceded that prebook orders, "in isolation," could have been protected by Section 381(a)(2). But it emphasized that the prebook orders did not exist in isolation, because Santa Fe had used the incentive agreements to require wholesalers to "accept and process" those orders. The department contended that Santa Fe "went beyond mere solicitation" because its employees, while in Oregon, delivered signed orders to wholesalers who had already agreed, in advance, to "accept and process" orders transmitted by Santa Fe's employees.

On that point, Santa Fe replied that the incentive agreements only required wholesalers to "accept and process" prebook orders, not to "fulfill" them.

---

[11] There was an initial appeal to the Magistrate Division of the Tax Court. For purposes of this opinion, it is sufficient for us to discuss only the proceedings in the Regular Division; the Magistrate Division is not a court of record, and the Regular Division hears appeals from the Magistrate Division *de novo. See Village at Main Street Phase II v. Dept. of Rev.*, 356 Or 164, 167-68, 339 P3d 428 (2014) (so explaining). We will generally use "Tax Court" to refer to the Regular Division.

Although the Tax Court ultimately was not persuaded by the department's argument regarding the "accept and process" requirement of the incentive agreements (the court concluded that "accept" was ambiguous, *see* 25 OTR at 151-53), the court nevertheless ruled in favor of the department. Relying on the Supreme Court's decision in *Wrigley*, the court held that the prebook orders were more than a "solicitation" because those orders had served an independent business purpose for Santa Fe beyond requesting the orders. "Writing down and forwarding the order for the [r]etailer on the spot made the difference between a potentially meaningless oral 'yes' and an actual order that was more likely to result in a sale." 25 OTR at 155-56. The Tax Court also concluded that Santa Fe's actions had exceeded the scope of Section 381 in a way that was not *de minimis*. *Id*. at 156-58. Because Santa Fe had exceeded the protections of Section 381(a)(2), the court concluded that it was subject to taxation in Oregon.[12] Santa Fe appealed that decision to this court.

## III.   DISCUSSION

The only issue before us is whether Section 381 "cuts off" Oregon's authority to tax Santa Fe's transactions within this state. It is undisputed that Oregon otherwise has authority to tax Santa Fe for income obtained here.[13] In

---

[12] The Tax Court also ruled in favor of the department on a separate question. The department had made an alternative argument that, because the incentive agreements required wholesalers to accept any and all returns of products by retailers, Santa Fe had also exceeded the protections of Section 381(c). That subsection provides that an out-of-state business is protected against being taxed in-state for the actions of "independent contractors," provided that the activities of the independent contractors on behalf of the business "consist solely of making sales, or soliciting orders for sales, of tangible personal property." 15 USC § 381(c). The department contended—and the Tax Court agreed—that Santa Fe's act of requiring wholesalers to accept all returns took Santa Fe outside the protections of Section 381. 25 OTR at 134-50.

As related to the "prebook orders," however, Santa Fe's representatives were not "independent contractors," but Santa Fe employees, and so they were not entitled to make in-state "sales" by Section 381(c); instead, their activities were limited to "solicitation of orders." And because we conclude in this opinion that Santa Fe's activities in Oregon fell outside the safe harbor of Section 381(a)(2), we need not reach the merits of the Tax Court's alternative holding that Santa Fe had also fallen outside the safe harbor created by Section 381(c).

[13] Santa Fe does not contend, for example, that Oregon's income tax here would violate the federal constitutional limitations imposed by the "dormant Commerce Clause."

other words: Santa Fe is liable for Oregon income tax unless the Section 381 safe harbor applies.

A.　*Standard of Review and Burden of Proof*

In the Tax Court, Santa Fe (as the party challenging the department's decision) had the burden to show, by a preponderance of the evidence, that its actions fell within the protections of Section 381. *See* ORS 305.427 (both before Tax Court and on appeal, "the party seeking affirmative relief" has burden of proof by "a preponderance of the evidence"); *Baisch v. Dept. of Rev.*, 316 Or 203, 211, 850 P2d 1109 (1993) ("A taxpayer seeking relief from a decision of the Department denying a deduction bears the burden of showing by a preponderance of the evidence that the deduction is allowable.").

We rely on the stipulated facts and exhibits, and we review the Tax Court's legal conclusions for errors of law. ORS 305.445.

B.　*Analysis*

As we will explain, Santa Fe's representatives went beyond soliciting orders on behalf of wholesalers. Because the wholesalers had already been committed by the terms of their incentive agreements to accept any prebook order, Santa Fe's representatives were doing more than "enabling" wholesalers to sell Santa Fe products to retailers. Instead, they were "requiring" wholesalers to sell those products and facilitating those sales. That exceeded the scope of the permitted "solicitation of orders."

We begin with the "prebook order" itself. As noted, such orders used a form prepared by Santa Fe and filled out by Santa Fe's representatives on behalf of their indirect customers, the Oregon retailers. Under the terms of all the incentive agreements, wholesalers were contractually obligated to accept and process those orders, and their right to receive future payments under the incentive agreements was contingent on complying with that contractual requirement.[14] Starting in 2011, Santa Fe added "sticks" to the

---

[14] We do not suggest that that the prebook order requirements were the only duties that the incentive agreements required wholesalers to undertake. The incentive agreements imposed at least one other primary and affirmative duty on the wholesalers: to accept product returns. The wholesalers had other duties,

incentive agreements to match the "carrot" of future payments. *See* 372 Or at 523-24 (discussing in detail). First, all wholesalers had to participate in the incentive agreements, so all future business with Santa Fe depended on the wholesalers accepting and processing those prebook orders. Second, a wholesaler who breached the incentive agreements by failing to accept and process prebook orders would not only lose those future payments under the incentive agreements, it would also be required to repay any payments already received. Again, the 2011 and 2012 incentive agreements expressly provided that

> "all of [the wholesaler's] obligations under this [incentive agreement] are material, that full performance of all of its obligations under this [incentive agreement] is essential, and that [Santa Fe] has no obligation to accept any product orders from, or make any monetary payments to, [the wholesaler] if [the wholesaler] breaches or in any way fails to perform in whole or part any provision or requirement of this [incentive agreement]."

When Santa Fe contractually required wholesalers to "accept and process" prebook orders, then, the wholesaler understood that it must comply with that obligation or the wholesaler would face substantial economic penalties and lose the right to continue selling Santa Fe products. As a result, the incentive agreements went beyond "facilitat[ing] the requesting of sales" and instead "facilitate[d] sales" by Santa Fe's representatives, *Wrigley*, 505 US at 233 (emphasis omitted), because the wholesalers had already been committed, by contract and by financial penalties, to complete the transaction. As such, prebook orders went beyond the scope of "solicitation of orders."[15]

---

though those largely seem to have been negative (*e.g.*, wholesalers were prohibited from selling Santa Fe's products in a manner that would violate state or federal law) or in support of the main duties (*e.g.*, wholesalers were required to retain records and permit Santa Fe to perform audits). The point remains, however: Santa Fe considered the acceptance and processing of prebook orders to be so important that it put the requirement into a contract that imposed substantial economic penalties for any breach.

[15] As noted, the Tax Court had concluded that the "accept and process" provision was ambiguous in a legal sense. For wholesalers, however, the economic realities represented by the phrase were entirely unambiguous: wholesalers had to accept prebook orders or become subject to immediate economic penalties by Santa Fe. That economic reality is much more relevant than the mere possibility

The term "solicitation of orders" is used in both Section 381(a)(1) and Section 381(a)(2). The Supreme Court's ordinary principles of statutory interpretation direct us to construe "solicitation of orders" to have the same meaning in both sections. *See Sullivan v. Stroop*, 496 US 478, 484, 110 S Ct 2499, 2504, 110 L Ed 2d 438 (1990) (the "normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning" (internal quotation marks and citations omitted)); *Wrigley*, 505 US at 225 (noting same principle).

Section 381(a)(1) shows that a "solicitation" does not include accepting the order (or shipping the goods). Again, that subsection protects "solicitation of orders" so long as "[the] orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State." The requirement that the approval occur outside the state might seem to be a mere formality, *see* Lohr-Schmidt, 22 Hastings LJ at 1083-84 (so noting), but it is necessary.

The requirement that acceptance occur *outside the state* does not apply to Section 381(a)(2), of course; the text of Section 381(a)(2) shows that a business's representatives may solicit orders on behalf of direct customers within the taxing state. But in both contexts, the activity must be limited to a "solicitation" of orders.

In *Wrigley*, the Supreme Court explained that "solicit" means "asking for" or "enticing to" or "approach with a request or plea." 505 US at 223 (internal quotation marks and citations omitted)). Nothing suggests that Santa Fe's representatives told retailers about the provision of the incentive agreements requiring wholesalers to "accept and process" prebook orders, much less that the representatives used it as a selling point to encourage the retailer

---

that expensive litigation might eventually lead to a court decision that would permit a wholesaler to refuse a prebook order without penalty.

For its part, Santa Fe argues that it is significant that the incentive agreements use the words "accept and process," rather than "fulfill." "Fulfill" is not a legal term of art, however. Santa Fe offers no authority or support for its implicit suggestion that the phrase "accept and process" unambiguously *excludes* a requirement that the wholesalers "fulfill" the order.

to buy Santa Fe's products. To the contrary: The sample "role plays" for representatives did not mention the "accept and process" obligation at all. From the perspective of the retailer, a prebook order was just a sell sheet order that someone else turned in for them. But it was no such thing from the perspective of a wholesaler—or from the perspective of Santa Fe, which had used the incentive agreements to make prebook orders amount to "guaranteed order[s]." Prebook orders, as something that wholesalers had already committed themselves to accept, thus facilitated the *sale* and not the *solicitation*. *See Wrigley*, 505 US at 233 ("[I]t is not enough that the activity facilitate *sales*; it must facilitate the *requesting of sales*, which this did not." (Emphases in original.)).

That conclusion also follows from the full definition of "solicitation of orders" that the Supreme Court articulated in *Wrigley*. The "accept and process" obligation that Santa Fe imposed was not "entirely ancillary to requests for purchases." *Id*. at 228 (emphasis omitted). The prebook order process, as set up by the incentive agreements, instead served an "independent business function apart from their connection to the soliciting of orders," *id*. at 228-29: It allowed Santa Fe's representatives to go beyond requesting sales and into facilitating sales on behalf of wholesalers, and to quickly have orders filled from stock that Oregon wholesalers were, in effect, holding for Santa Fe in-state. A wholesaler could not refuse to "accept and process" a single Santa Fe prebook order without risking future incentive payments for *every* Santa Fe product that it sold to *every* retailer, and, starting in 2011, a wholesaler risked being required to repay *every* incentive payment that it had already received for sales to *every* retailer. Thus, Santa Fe was doing far more than simply "enabling" Oregon wholesalers to sell Santa Fe's products.[16]

---

[16] The Tax Court reached a similar conclusion, but on much narrower grounds. It correctly recognized that prebook orders increased the chances of a sale of Santa Fe's products, but the court's analysis seems to have relied almost entirely on the act of Santa Fe's representative transmitting the prebook order to the wholesaler. *See* 25 OTR at 154-56. Our holding does not rely on the narrow act of transmission. We conclude that prebook orders should be considered in light of the contractual obligations and economic realities that Santa Fe's incentive agreements imposed on wholesalers.

As we will explain, Santa Fe used prebook orders—bolstered by the incentive agreements—in the same way that the gum manufacturer in *Wrigley* used "agency stock checks." Again, Wrigley's representatives would fill free gum displays using the stock of gum that the representative had brought into the state, requiring the retailer to pay a wholesaler for the gum. *See Wrigley*, 505 US at 218. Wrigley thus had exceeded the scope of Section 381(a)(2) in two different ways. First, "Wrigley *made the retailers pay for the gum*, thereby providing a business purpose for supplying the gum quite independent from the purpose of soliciting consumers." *Id*. at 234 (emphasis in original). Second, the representatives' in-state stock of gum to fill the displays—a stock that the retailers had to pay for—also exceeded the protections of Section 381. *Id*.

That parallels what Santa Fe did here. When Santa Fe's representatives obtained a prebook order from an Oregon retailer, they were not just soliciting orders. They were facilitating sales on behalf of wholesalers, who were for practical purposes already committed to accept those sales. And, because Oregon wholesalers had no true ability to decline the sale, the wholesaler's stock of Santa Fe products functioned as if Santa Fe itself had stored the stock in-state—also falling outside the scope of Section 381(a).

In our view, then, prebook orders cannot be reduced to a Santa Fe representative performing the "ministerial" act of "push[ing] the button on a fax machine," as Santa Fe argues. (Emphasis omitted.) That framing would ignore the economic structure that Santa Fe had constructed around "prebook orders," using its incentive agreements with wholesalers.

Considered in its factual and legal context, then, Santa Fe and its representatives exceeded the scope of "solicitation of orders" as that term is used in Section 381(a)(2) when they obtained prebook orders from Oregon retailers.

C.  *Prebook Orders Were Not De Minimis*

That does not end our analysis. In *Wrigley*, the Supreme Court further explained that "the venerable maxim *de minimis non curat lex* ('the law cares not for trifles')"

applies to Section 381. 505 US at 231. A company should not become "liable for hundreds of thousands of dollars in taxes if one of its salesmen sells a 10-cent item in state." *Id.* In the context of Section 381, the Court held that

> "whether in-state activity other than 'solicitation of orders' is sufficiently *de minimis* to avoid loss of the tax immunity conferred by [Section] 381 depends upon whether that activity establishes a nontrivial additional connection with the taxing State."

*Id.* at 232.

The Court then explained why it concluded that the *de minimis* principle did not protect Wrigley under those facts:

> "Wrigley's sales representatives exchanged stale gum, as a matter of regular company policy, on a continuing basis, and Wrigley maintained a stock of gum worth several thousand dollars in the State for this purpose, as well as for the less frequently pursued (but equally unprotected) purpose of selling gum through 'agency stock checks.' Although the relative magnitude of these activities was not large compared to Wrigley's other operations in Wisconsin, we have little difficulty concluding that they constituted a nontrivial additional connection with the State."

*Id.* at 235.

Here, the parties stipulated that Santa Fe's representatives obtained an average of 13.3 prebook orders per month from Oregon retailers. That, combined with exhibits showing Santa Fe's strong emphasis on its representatives obtaining prebook orders, is sufficient for us to conclude that its actions were not *de minimis*. Like Wrigley, Santa Fe was engaging in the unprotected activity "as a matter of regular company policy, on a continuing basis." *Id.* The number of such orders per month is also not *de minimis*. Thus, "we have little difficulty concluding that they constituted a nontrivial additional connection with the State." *Id.*[17]

---

[17] Although the record does not give the value of prebook orders or compare the size of those orders to Santa Fe's other sales within the state, we agree with the Tax Court: In this context, the burden rested on Santa Fe to come forward with evidence that the sales were trivial. ORS 305.427 (both before Tax Court and on appeal, "the party seeking affirmative relief" has burden of proof by "a preponderance of the evidence"); *see* 25 OTR at 157-58 (so concluding).

## III.    CONCLUSION

For the reasons set out above, we conclude that Santa Fe's business activities—specifically, the pursuit of prebook orders by its representatives in Oregon, invoking incentive agreement contractual provisions used by Santa Fe to ensure that wholesalers treated each one of those orders favorably—exceeded the scope of permitted "solicitation of orders" under Section 381(a)(2). We further agree that Santa Fe's activities were not *de minimis*. Accordingly, Santa Fe was subject to Oregon income tax.

The judgment of the Tax Court is affirmed.

---

Unlike the Tax Court, however, we would add that it is far from clear that the size of a business's protected activities has any bearing on whether the unprotected activities create a nontrivial additional connection. *See Wrigley*, 505 US at 235 (unprotected activities made nontrivial additional connection, even though "the relative magnitude of these activities was not large compared to Wrigley's other operations in Wisconsin").